PARTIDO NUEVO PROGRESISTA, recurrente, *v.* TRIBUNAL ELECTORAL DE PUERTO RICO, recurrido.

*Número:* O-75-490    *Resuelto:* 31 de marzo de 1976

*Eugenio S. Belaval Martínez,* abogado del recurrente; *Ramírez & Rivera,* abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

El presente caso exige la conjugación de importantes derechos individuales constitucionales con el derecho comuni-

tario expuesto en el Código Electoral de Puerto Rico, Ley Núm. 1 de 13 de febrero de 1974 según enmendada (16 L.P.R.A. sec. 2001 *et seq.*), que aspira a perfeccionar la pureza del proceso electoral y nuestro sistema democrático de gobierno representativo mediante la imposición de límites a las contribuciones o aportaciones económicas de carácter político y la oportuna auditoría de las finanzas de los partidos políticos.

El recurrente Partido Nuevo Progresista (PNP), impugna la Resolución del Tribunal Electoral de Puerto Rico que en 22 de octubre de 1975 le ordenó al examen y producción de ". . . los libros, cuentas, récords de contabilidad y demás documentos relacionados con [sus] operaciones fiscales, efectuadas . . . durante el período comprendido entre el 3 de febrero de 1974 y el 30 de junio de 1975." Dicho dictamen intenta continuar, en igualdad de condiciones, un plan general establecido sobre intervención y cotejo de la contabilidad de los partidos políticos principales y por petición, el cual se inició con la investigación de la contabilidad del Partido Popular Democrático—al presente ya finalizada—está en proceso la del Partido Independentista Puertorriqueño y oportunamente cubrirá a los restantes.

Nos solicita dictemos un *injunction* permanente y en apoyo del mismo discute tres errores que formula en las siguientes proposiciones: el Tribunal Electoral es un organismo que requiere delegación expresa de poderes para intervenir los libros de un partido político; careciendo de esta autoridad expresa ese poder no es reclamable como implícito; y de existir tal poder, su ejercicio conlleva "una violación de los derechos de libre asociación de los afiliados al [recurrente] bajo la enmienda primera de la Constitución Americana y la Sec. 6 del Art. II de nuestra propia constitución y violación de las garantías de las Secs. 2 y 4 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico."

# I

Analicemos conjuntamente los dos primeros señalamientos. Se argumenta que siendo el Tribunal Electoral un organismo al cual le son aplicables las doctrinas jurídicas de derecho administrativo, [1] el poder de intervenir la contabilidad de los partidos políticos debe surgir expresamente del Código Electoral; ausente el mismo no puede reclamarse como implícita su existencia ni sostenerse el que emprenda "expediciones de pesca" (*fishing expeditions*); máxime ante la inacción de la Asamblea Legislativa en relación al P. de la C. 1764, alegadamente radicado a instancias del Tribunal Electoral y encaminado a reconocerle la autoridad aquí impugnada.

■ No le asiste la razón. Varias disposiciones del Código Electoral y nuestra doctrina jurisprudencial en el campo de derecho administrativo nos lleva a concluir que el tribunal recurrido no sólo posee facultad, sino el deber en ley para requerir de los distintos partidos políticos la presentación de sus libros de contabilidad. A tal efecto, en virtud del Art. 2-007 (16 L.P.R.A. sec. 2027), la Asamblea Legislativa lícitamente [2] delegó en el Tribunal Electoral ". . . la

---

[1] Véase *P.N.P.* v. *Tribunal Electoral,* 104 D.P.R. 1 (1975).

[2] La Constitución concedió al Poder Legislativo un amplísimo margen de autoridad para legislar en asuntos de materia electoral:

"Será objeto de reglamentación por ley todo lo concerniente al proceso electoral y al proceso de inscripción de electores en los registros electorales, así como todo lo relativo a los partidos políticos. Las disposiciones de esta constitución no deben entenderse en el sentido de limitar o menoscabar tal facultad. Otra cosa sería hacer imposible la aprobación de leyes electorales por el poder legislativo. Amplia ha de ser también—sin limitaciones que la harían imposible de ejercitar—la facultad de la Asamblea Legislativa en cuanto a lo concerniente al proceso de inscripción de electores en los registros electorales, a la formación de tales registros, y a los medios para que en ellos sean inscritos los electores legales, así como para que de ellos sean eliminados los electores sin capacidad legal o que no reúnan los requisitos señalados por esta constitución [o] la ley. Amplia ha de ser asimismo la facultad de la Asamblea Legislativa para regular todo lo concerniente a la manera en que se han de depositar y contar los votos en las elecciones y la forma de practicar el escrutinio de tales votos. Y amplia

organización, dirección y supervisión de todos los procedimientos relacionados con [las] elecciones", y en el Art. 2-009 (16 L.P.R.A. sec. 2029), taxativamente le confirió ". . . el poder de . . . obligar a la presentación de libros, papeles y documentos que considere necesarios y pertinentes en cualquier procedimiento que celebre y *para realizar todos los actos necesarios en el ejercicio de sus funciones y deberes.*" Obviamente, este poder abarca trámites y procedimientos relacionados con la reglamentación, investigación y adjudicación de aquellos asuntos electorales comprendidos en el Código, entre los cuales se destaca la supervisión y fiscalización de las operaciones financieras de los partidos políticos y candidatos, por resultar una gestión consustancial, lógica y necesaria en la implementación y garantía del cumplimiento de los deberes que la ley impone a los partidos políticos y candidatos independientes en sus Arts. 3-007, 3-008 y 3-009. [3]

---

ha de ser la facultad legislativa para reglamentar todos los detalles concernientes al ejercicio del voto y al mecanismo e instrumentación de dicho ejercicio." *Diario de Sesiones de la Asamblea Constituyente de Puerto Rico*, pág. 2621 (ed. 1961).

(3) Rezan del siguiente modo:

"Artículo 3-007—Contabilidad e Informes del Fondo Electoral.—

"Cada partido político y cada candidato independiente deberá llevar una contabilidad completa y detallada de cualquier gasto incurrido por el mismo con cargo al Fondo Electoral, y rendir un informe, bajo juramento, cada dos (2) meses, dentro de los primeros diez (10) días del mes siguiente, al Tribunal Electoral y al Secretario de Hacienda, certificando tales gastos, incluyendo la fecha, el nombre de la persona a favor de quien se ordenó el pago y su dirección completa, así como el concepto por el cual se incurrió en dicho gasto.

"El Secretario de Hacienda no autorizará desembolso alguno contra el Fondo Electoral, para ese partido político o candidato independiente, hasta tanto se cumpla con la obligación impuesta por este artículo.

"Artículo 3-008—Contribuciones permitidas.—

"Cualquier persona podrá contribuir voluntariamente una cantidad que no exceda de cuatrocientos (400) dólares anuales a candidato de partido político, candidato independiente, organismo directivo municipal o central de cualquier partido político, y en ningún caso la contribución anual total de una persona sumará más de ochocientos (800) dólares. En años de elecciones, cualquier persona podrá contribuir con una cantidad que no excederá de seiscientos (600) dólares al organismo directivo muni-

La actuación del tribunal recurrido no sólo encuentra apoyo en las disposiciones del Código antes expuestas, sino en nuestro marco doctrinario de derecho administrativo sobre materia investigativa: *Comisionado de Seguros* v. *Bradley*, 98 D.P.R. 21 (1969) y *Cooperativa Cafeteros* v. *Colón Torres*, 84 D.P.R. 278 (1961). En este último caso hicimos el siguiente pronunciamiento:

"Se ha establecido jurisprudencialmente que las agencias tienen amplios poderes para solicitar información e investigar los organismos que la ley le autoriza reglamentar y supervisar. Originalmente se había sostenido que las agencias administrativas no podían hacer expediciones de pesca en los organismos que reglamentaren, *Fed. Trade Comm.* v. *Amer. Tabacco Co.*,

---

cipal o central de cualquier partido político, a un candidato de partido político o a un candidato independiente, y en ningún caso las contribuciones anuales totales de esa persona podrán sumar más de mil (1,000) dólares. Será ilegal acumular las cantidades dejadas de aportar en un año, dentro del límite establecido, en años posteriores, o adelantar las cantidades permitidas de otros años, en un solo año.

"La cantidad máxima con que puede contribuir una persona, natural o jurídica, en una primaria o elección interna de partido, será de cien (100) dólares.

"Ningún candidato que haya recibido contribuciones para su campaña podrá transferir las mismas, o parte de las mismas directa o indirectamente, a ningún partido político o a ningún otro candidato.

"Las contribuciones que se hagan a partidos políticos coligados estarán sujetas a las limitaciones aquí dispuestas como si se tratare de un solo partido político.

"Ninguna persona que tenga control o interés mayoritario en una corporación, sociedad, o empresa, que haya hecho una contribución en su carácter personal, podrá repetir la misma a través y a nombre de aquella corporación, sociedad o empresa donde dicha persona tenga control o interés mayoritario.

"La persona que eligiere hacer su contribución a través y a nombre de una o más corporaciones, sociedades o empresas en la que ejerza control o tenga interés mayoritario, no podrá repetir la misma en su carácter personal.

"Será ilegal toda contribución de una institución bancaria para fines electorales.

"Artículo 3-009—Contabilidad e informes de otros ingresos y gastos.—

"A) Cada partido político y cada candidato deberá llevar una contabilidad completa y detallada de toda contribución recibida y gasto incurrido por el mismo, sin cargo al Fondo Electoral, y rendir un informe cada

264 U.S. 298 (1924) pero la tendencia desde que se resolvió el caso de *United States* v. *Morton Salt Co.*, 338 U.S. 632 (1950) es reconocer a las agencias administrativas amplios poderes para solicitar información e investigar los organismos que estos regulan y supervisan. I Davis, *Administrative Law*, Sec. 3.06 (ed. 1958)." (Pág. 284.)

· · · · · · ·

"En la obra de Davis, antes citada, al resumir el estado de la ley, en la materia que ahora consideramos, se afirma que ha ocurrido un cambio radical a partir de la década del 1940. Y que ahora se permiten las expediciones de pesca, que casos anteriores del Tribunal Supremo nacional habían proscrito. Afirma que *Morton Salt,* definitivamente estableció la pauta que prevalece en esta fase del derecho administrativo. Davis, *op. cit.* Sec. 3.14."

· · · · · · ·

"Vemos pues que la única limitación que tienen los organismos reguladores y supervisores es que la información solicitada esté dentro de la autoridad de la agencia, el requerimiento no sea

tres meses, bajo juramento, en donde se expondrá una relación de dichas contribuciones y gastos, fecha en que se recibieron dichas contribuciones y se incurrieron en dichos gastos, nombre y dirección completa de la persona que hizo la contribución o a favor de quien se hizo el pago, así como el concepto por el cual se incurrió en dicho gasto.

"B) Cuando en cualquier acto político masivo, incluyendo *mass meeting,* se efectúe una recaudación de dinero, el recaudador o los recaudadores deberán, luego de efectuada la recaudación, levantar un acta juramentada, haciendo constar el total del dinero recaudado y que ninguno de los donantes aportó cantidad alguna en exceso de las cantidades permitidas en este Código. Dicha acta deberá radicarse en el Tribunal Estatal dentro de los cinco (5) días siguientes.

"C) Comenzando el primero de marzo de un año de elecciones generales, hasta el día último de dicho año, el informe de que se trata el apartado (a) de este artículo deberá rendirse ante el Tribunal Electoral cada quince (15) días.

"D) Las disposiciones de los incisos anteriores serán aplicables a las primarias y elecciones internas de los partidos, y los informes se radicarán en las fechas que disponga el Tribunal Electoral por reglamento.

"E) A los fines de radicar los informes requeridos de este artículo, se constituirá en candidato todo aquel que en cualquier momento antes de su nominación, por sí o a través de otra persona, grupo o entidad, reciba una contribución para ser utilizada en una elección en la cual el recipiente de la contribución haya de figurar como candidato." (16 L.P.R.A. secs. 2087, 2088 y 2089.)

demasiado indefinido y la información sea razonablemente relevante." (Págs. 285-286.)

No milita en contra de esta decisión, la iniciativa del Tribunal Electoral en gestionar una enmienda al Código con miras a taxativamente autorizarlo a contabilizar los libros de los partidos políticos y candidatos independientes y la no aprobación por el Poder Legislativo de la misma.

■ De ordinario, por razón de la propia naturaleza del proceso legislativo, la inacción de la Legislatura en torno a una propuesta enmienda—sin dejar de ser pertinente a la interpretación de la ley, y ocasionalmente factor de peso determinante—no es concluyente, pues es susceptible de variadas y encontradas interpretaciones. *Per se*, no niega la existencia de la autoridad que mediante la presente decisión sostenemos al profundizar judicialmente y darle verdadero significado al sentido espiritual e integral del Código Electoral a tono con los propósitos fijados en el mismo y los principios establecidos en el campo del derecho administrativo. *P.S.P.* v. *Tribunal Electoral*, 104 D.P.R. 230 (1975). La experiencia nos señala situaciones en que para obviarse controversias y litigios, un organismo público acude a la Asamblea Legislativa para que en términos claros e inequívocos, mediante enmienda aclaratoria, se despejen las dudas existentes en torno a sus funciones y prerrogativas con relación a prácticas administrativas prevalecientes. Compárese: *Pardavco, Inc.* v. *Secretario de Hacienda*, 104 D.P.R. 65 (1975).

## II

El tercer y último error que señala el recurrente sostiene que la autoridad reclamada por el Tribunal Electoral en la resolución recurrida es inconstitucional porque *"infringe los derechos constitucionales de asociación, libertad de expresión y secretividad del sufragio."* Como fundamento del mismo cita casos estatales y federales de la juris-

dicción norteamericana (⁴) en que se ha decidido que la intervención de una agencia administrativa gubernamental en los libros y récords de los partidos políticos tiene el efecto de desalentar la acción (*chilling effect*) de innumerables personas—que por razones personales o temor a represalias políticas desean mantener secreta su afiliación—violando ello el derecho a libre asociación; teniendo como consecuencia, al inhibirse éstos de aportar y contribuir pecuniariamente al partido político de preferencia, la disminución de las finanzas del partido y su capacidad de informar al electorado, coartando indebidamente el derecho a la libre expresión y asociación.

El Preámbulo de nuestra Constitución, al proclamar el sistema democrático como la base fundamental para la vida y coexistencia de la comunidad puertorriqueña lo define como "aquel donde la voluntad del pueblo es la fuente del poder público, donde el orden político está subordinado a los derechos del hombre y donde se asegura la libre participación del ciudadano en las decisiones colectivas." La Carta de Derechos en sus Secs. 2, 4 y 6, (⁵) respectivamente establece que dicha voluntad se exprese mediante el sufragio universal, igual, directo, secreto y libre de coacción, para lo cual la existencia de la libertad de palabra y asociación son esenciales. La Asamblea Legislativa, en virtud de la Sec. 4 del Art. VI, quedó encomendada de proveer le-

---

(⁴)*Pollard* v. *Roberts*, 283 F.Supp. 248 (1968); *Deras* v. *Myers*, 535 P.2d 541 (1975); *Columbia Broadcasting System, Inc.* v. *Democratic Committee*, 412 U.S. 94 (1972).

(⁵) Disponen así:

"Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral.

"No se aprobará ley alguna que restrinja la libertad de palabra o de prensa o el derecho del pueblo a reunirse en asamblea pacífica y a pedir al gobierno la reparación de agravios.

"Las personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares."

gislación en "todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidatos."

Nuestro sistema de gobierno democrático se nutre del proceso político para elegir aquellos que representan al pueblo, reconociendo el derecho de los ciudadanos a organizarse en grupos de opinión con carácter de partidos políticos y proponer candidatos de su predilección. *Dávila* v. *Secretario de Estado*, 83 D.P.R. 186 (1960).

Ante los adelantos técnicos de comunicación rápida, directa y masiva, el libre intercambio y la fluidez de ideas y la discusión en torno a los asuntos públicos y las cualificaciones de los candidatos, dependen en gran medida de la capacidad económica de éstos y los partidos políticos. El mensaje personal de antaño en las lides electorales puertorriqueñas es hoy la excepción, descansándose cada vez más en los medios electrónicos de difusión moderna. Ante este fenómeno, y el costo que ello exige, las contribuciones del ciudadano a sus respectivos partidos políticos son vitales para el desenvolvimiento y desarrollo del proceso democrático.

De gran significación al caso que nos ocupa es el siguiente pensamiento plasmado en el Informe de la Carta de Derechos de la Convención Constituyente: "El más amplio reconocimiento del derecho a diferir y ser, *no obstante, tratado con igualdad y protegido en esa diferencia por el poder público*, es uno de los rasgos definidores de la democracia liberal. De esta disposición suya a convivir con el opositor y *darle plena oportunidad para que en el debate político* cambie de crítico en dirigente cuando gane la confianza electoral, deriva buena parte de su fuerza creadora y renovadora. Es éste el único régimen que se complace en el vigor fecundante de las diferencias mantenidas en el marco de una lealtad básica a los principios y a la metodología de la democracia." *Diario de Sesiones*, págs. 2562–2563 *op. cit.* (Énfasis suplido.)

Aun cuando no existe una correlación entre los resultados electorales y la capacidad económica de un partido político o candidato—ya que en adición entran en juego un sinnúmero de factores tales como naturaleza de las controversias, organización, liderazgo, destreza, prestigio, control y extensión de información y publicidad—las contribuciones económicas y por ende, la solvencia de los partidos políticos afectan positiva o negativamente y en gran medida los factores mencionados y por ende el desenlace final.

■ Estimamos que en el contexto constitucional expuesto, son cognoscibles, como objetivos legítimos consustanciales al proceso democrático, medidas razonables tendentes a disminuir las diferencias económicas y ventajas entre los partidos y candidatos por razón de desigualdades en riqueza, a la par que evitar contribuciones cuantiosas e irrestrictas que pudieran comprometer el curso ulterior del gobierno en orden a influencias indebidas o favoritismos por razón de tales aportaciones.

El logro de estos objetivos y circunstancias político-históricas pusieron a Puerto Rico en la vanguardia en materia de legislación sobre subsidio gubernamental, [6] creándose el Fondo Electoral, el cual provee a todos los partidos políticos principales y por petición, irrespectivamente de las prédicas e ideologías promulgadas, una capacidad económica inicial e igualitaria para la divulgación de ideas y mensajes en nuestro país.

La Exposición de Motivos de la Ley Núm. 110 del 30 de junio de 1957 refleja claramente las premisas legislativas que inspiraron el Fondo Electoral:

"Es principio universalmente reconocido que los partidos

[6] Wells, Henry: *Government Financing of Political Parties in Puerto Rico;* Citizens' Research Foundation, Study Number Four (1962); Wells & Anderson: *Government Financing of Political Parties in Puerto Rico,* A Supplement to Study Number Four; Citizens' Research Foundation (1966).

políticos son instrumentos necesarios a la democracia para que a través de ellos el pueblo pueda respaldar programas y expresar mandatos con relación a su gobierno. Todos los partidos democráticos, mayoría y minoría, cumplen estas funciones: los de la mayoría en respaldo a la obra de gobierno que representa la opinión mayoritaria, pero que debe ser llevada a cabo en beneficio de todo el pueblo, sin distinción partidista; los de la minoría para que expresen el punto de vista de otra parte del pueblo con miras a tratar de convencer a una mayoría para ciertos fines distintos en ciertas formas diferentes, y velar porque el programa respaldado por la mayoría sea en efecto administrado con igualdad para todos.

Por tales razones, es de profundo interés público el que los partidos políticos puedan estar libres de control por fuerzas económicas, privadas o gubernamentales, que, al hacerse necesarias para el financiamiento de las actividades legítimas normales de los partidos políticos, puedan adquirir sobre ellos un control o influencia contrarios a la idea democrática, a la libertad política del pueblo en general y el funcionamiento genuino de la democracia.

Es por eso que la asamblea legislativa considera sabio el que, por una parte, se prohíban grandes contribuciones financieras a los partidos políticos, y, por otra, se les provea a estos organismos democráticos de algunos fondos adecuados para el cumplimiento de sus funciones más esenciales, independientemente del deber que cada ciudadano tiene de contribuir al sostenimiento de su colectividad política con pequeñas cantidades compatibles con sus ingresos y con las normas que cada partido adopte dentro de los propósitos y fines de esta ley."

En el Código Electoral vigente se mantiene el Fondo Electoral y se establecen limitaciones al monto de contribuciones anuales que individualmente un ciudadano puede aportar al partido de su predilección.[7] Arts. 3-001 a 3-008 (16 L.P.R.A. secs. 2081 a 2088).

---

[7] En los Estados Unidos, tanto la Ley Federal como la de una mayoría de los estados contienen legislación que limita las contribuciones para fines de campañas electorales. Véase una relación al respecto en *The Book of the States*, págs. 42–47 (1974–75).

Es prolífera la literatura reciente sobre materia electoral en los Estados Unidos. Consúltese: Fleishman, *The 1974 Federal Election Cam-*

■  Bajo un enfoque de estricto escrutinio judicial, *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267 (1975), es válido el axioma básico que fluye en el Código Electoral de que el proceso político decisional puertorriqueño responda en su realidad al mandato de igualdad consagrado en nuestra Ley Fundamental; ello se logra imponiendo limitaciones al monto de contribuciones político-partidistas. La constancia, preservación y presentación de data e informes sobre el particular, y la oportuna intervención y contabilidad de los mismos, son consecuencia natural e imprescindible para garantizar el cumplimiento de los límites legales establecidos en materia de finanzas políticas.

*paign Act Amendments: The Shortcomings of Good Intentions*, 1975, Duke L.J. 851; Teicher, *Recent Cases—Constitutional Law Elections—Limit on Candidate Expenditures and Campaign Contributions Violates State Free Speech Guarantee*, 28 Vand. L. Rev. 1127 (1975); *Developments in the Law—Elections*, 88 Harv. L. Rev. 1111, 1233 (1975); Weitzman, *Expenditure Limitations in Campaigns for State-Wide Office in California*, 6 Pacific L.J. 631 (1975); Grover, *Election Law—Initiative 276—The Constitutionality and Feasibility of Political Campaign Expenditure Limitations in Washington—Bare* v. *Gordon, 84 Wn.2d 380, 526 P.2d 379 (1974)*, 50 Wash. L. Rev. 794 (1975); Nicholson, *Campaign Financing and Equal Protection*, 26 Stan. L. Rev. 815 (1974); *Comment—The Constitutionality of Restrictions on Individual Contributions to Candidates in Federal Elections*, 122 U. Pa. L. Rev. 1609 (1974); *The Constitutionality of Financial Disclosure Laws*, 59 Cornell L. Rev. 345 (1974); M.C.S., *Recent Developments—Constitutional Law—First Amendment—Prior Restraints Imposed by the Federal Election Campaign Act of 1971*, 41 Tenn. L. Rev. 906 (1974); Gallagher, Jr., *New Jersey Election Reform, A New Law for Old Campaigners*, 27 Rutgers L. Rev. 836 (1974); Biden, Jr., *Public Financing of Elections: Legislative Proposals and Constitutional Questions*, 69 Nw. U. L. Rev. 1 (1974); Fleishman, *Public Financing of Elections Campaigns: Constitutional Constraints on Steps Toward Equality of Political Influence of Citizens*, 52 N.C. L. Rev. 349 (1973); Fleishman, *Freedom of Speech and Equality of Political Opportunity: The Constitutionality of the Federal Election Campaign Act of 1971*, 51 N.C. L. Rev. 389 (1973); Court & Harris, *Free Speech Implications of Campaign Expenditures Ceilings*, 7 Harvard Civil Rights—Civ. Lib. L. Rev. 214 (1972); Redish, *Campaign Spending Laws and the First Amendment*, 46 N.Y.U. L. Rev. 900 (1971); y Tobel, *Federal Control of Campaign Contributions*, 51 Minn. L. Rev. 1 (1967).

Existe un interés superior en la escala de valores constitucionales, congruente y medular a un sistema de gobierno de verdadera democracia representativa que exige que la integridad y pureza del proceso electoral no sea conculcada por las influencias nocivas, sean en apariencia o reales, que ocasionalmente generan las grandes aportaciones de individuos o intereses económicos.

■ Estas restricciones y la obligación de informarlas afectan solamente y de manera incidental los derechos de libre expresión y de asociación del individuo. La contribución individual constituye más bien una expresión amplia y general en apoyo de un partido político o candidato, y no una particular expresión de ideas o mensaje de contenido específico. Necesariamente ese contenido no aumenta en orden a la cuantía aportada. Tales aportaciones no se dan acompañadas o condicionadas a un texto o mensaje individual preciso y particular, y no representan un ejercicio puro y directo del derecho de palabra. Irremisiblemente la expresión amplia que acompaña a la contribución queda diluida en los fondos generales del partido o candidato y su uso eventual, aun cuando sea destinado para difundir ideas afines del ciudadano que los aporta, no implica correspondencia exacta ni directa con sus propias palabras. La aportación conlleva y se transforma en un ejercicio de la palabra por tercera persona y no el contribuyente. Véase: *Buckley et al.* v. *Valeo* (44 U.S.L.W. 4127, 4133 (U.S. Jan. 30, 1976)).

La imposición de límites en las contribuciones tiende a lograr la igualdad entre todos los ciudadanos, y en lugar de infringir la libre expresión—al obligar a todos los partidos y candidatos a apelar y gestionar fondos de un mayor número de personas—promueve una mayor diseminación e intercambio de ideas, y un incremento sustancial de participación legítima ciudadana en el proceso eleccionario: intereses de mayor valía en la concepción de una democracia verdadera que superan el impacto incidental sobre esta modalidad del derecho a la

libre expresión. Como corolario de lo anterior, en vez de vulnerarse el derecho de asociación se impulsa el mismo ya que los organismos directivos políticos redoblarán sus esfuerzos para aumentar el número de miembros activos en su afán de solventar sus actividades.

Debemos recordar que aun cuando "[c]onocidas consideraciones históricas sustentan la preeminencia [del derecho a la libre expresión], raíz indiscutible del sistema democrático de gobierno . . . este valor superior no supone una irrestricción absoluta, de forma que no pueda subordinarse a otros intereses cuando la necesidad y conveniencia públicas lo requieran . . . [siendo] precisamente esta área la que nos corresponde deslindar en cada caso específico." *Mari Bras* v. *Casañas*, 96 D.P.R. 15, 20–21 (1968). (Citas y escolios omitidos.) (⁸)

▆▆ Lo expuesto nos convence que el argumento en torno a que la secretividad del voto se viola al permitirse el examen de los libros de contabilidad no puede prevalecer. Igual que los anteriores derechos constitucionales, el requisito de que el voto sea secreto, se dispuso con el propósito de ". . . asegurar la inviolabilidad del albedrío del elector." Existe suficiente constancia en el legajo constitucional de que el mismo no era absoluto y admite limitaciones fundadas. (⁹) *Op cit.*, pág. 1407. En el balance de intereses envueltos, resulta mínimo el impacto,

---

(⁸) En *E.L.A.* v. *Hermandad de Empleados*, 104 D.P.R. 436 (1975), analizamos la limitación a una modalidad del derecho a la libre expresión consistentes de protestas mediante el uso de piquetes frente al hogar de un funcionario público en contraposición al derecho a la protección de la vida privada y familiar.

En el ámbito constitucional federal, el Tribunal Supremo hace más de una década reafirmó su rechazo al concepto de que la libertad de expresión y asociación protegidas por la Primera y Décimo Cuarta Enmiendas son absolutas. *Konigsberg* v. *State Bar*, 336 U.S. 36, 49 (1960).

(⁹) Resulta interesante la concepción de que el derecho al voto secreto, en palabras de un miembro de la Asamblea Constituyente, era ". . . para garantizar y proteger al ciudadano de las coacciones para garantizarle su libertad de poder entrar a la caseta electoral, secretamente, solo con su conciencia a hacer allí su cruz, sin que a nadie le importe cómo y dónde la hizo." *Op. cit.*, pág. 1402.

si alguno, sobre este derecho, independientemente de que el argumento descansa en la premisa errónea—que niega parcialmente al elector el libre albedrío que se intenta proteger— de postular que un ciudadano, por el solo hecho de haber contribuido económicamente a determinado partido político o candidato, está obligado a votar indefectiblemente por éstos, sin considerar que debido a un sinnúmero de razones puede optar por votar de manera distinta.

Precisamente, el Tribunal Supremo de los Estados Unidos sostuvo la constitucionalidad de disposiciones parecidas a la nuestra, existentes en la Ley Federal de Campañas Electorales de 1974 (Pub. L. No. 92–225, 86 Stat. 3, según enmendada por Pub. L. No. 93–443, 88 Stat. 1263), en el caso de *Buckley et al.*, supra, expresándose del siguiente modo:

"[H]emos reconocido que hay intereses gubernamentales lo suficientemente importantes para sobrepasar la posibilidad de infracción, especialmente cuando se trata del 'libre funcionamiento de nuestras instituciones nacionales.' *Communist Party* v. *Subversive Activities Control Bd.*, 367 U.S. 1, 97 (1961).

Los intereses gubernamentales que se intentan vindicar por los requisitos de divulgación son de esa magnitud. Se agrupan en tres categorías. Primero, la divulgación provee al electorado información 'sobre de dónde proviene el dinero para la campaña política y cómo lo gasta el candidato' para ayudar a los votantes a valorar aquellos que desean un puesto Federal. Le permite a los votantes el colocar a cada candidato en el espectro político con más precisión de la que a menudo es posible lograr solamente a base de las insignias de partidos y los discursos de campaña. Los orígenes del apoyo financiero de un candidato también alertan al votante en cuanto a los intereses a los cuales el candidato con más probabilidad responderá y ello facilita las predicciones sobre el futuro desempeño de sus funciones.

Segundo, los requisitos de divulgación desalientan la corrupción existente y evitan la aparición de la corrupción al exponer a la luz pública grandes contribuciones y gastos. Esta exposición puede desalentar a aquellos que usarían dinero con propósitos indebidos ya sea antes o después de las elecciones. Un público armado con información sobre los más generosos partidarios de

un candidato está en mejor disposición de detectar cualesquiera favores especiales post-electorales que puedan darse a cambio. Y, según reconocimos en *Burroughs* v. *United States,* 290 U.S., a la página 548, el Congreso podría concluir razonablemente que la total divulgación durante una campaña eleccionaria tiende a 'impedir el uso corrupto de dinero para afectar las elecciones.' Al promulgar estos requisitos el Congreso pudo haber tenido presente la recomendación del Juez Brandeis: 'La publicidad está justamente recomendada como un remedio para los males sociales e industriales. Se dice que la luz solar es el mejor desinfectante; la luz eléctrica es el policía más eficiente.'

Tercero, y no menos significativo, los requisitos de mantener récords, de información y divulgación son un medio esencial para reunir los datos necesarios para detectar violaciones de las limitaciones de donativos antes descritas.

Los requisitos de divulgación, como cuestión general, sirven directamente a intereses gubernativos sustanciales. Al determinar si estos intereses son suficientes para justificar los requisitos debemos considerar el alcance de la carga que ponen sobre los derechos individuales.

Es indudablemente cierto que la divulgación pública de los donativos a los candidatos y partidos políticos desalentarán a algunos individuos que de otra forma podrían contribuir. En algunos casos, la divulgación puede hasta exponer a los donantes al hostigamiento o la represalia. Estas no son cargas insignificantes sobre los derechos individuales, y deben sopesarse cuidadosamente contra los intereses que el Congreso ha intentado fomentar con esta legislación. En este proceso, notamos y estamos de acuerdo con la admisión del apelante de que los requisitos de divulgación—ciertamente en la mayoría de los casos en que aplican—parecen ser el medio menos restrictivo para refrenar los males de ignorancia y corrupción de la campaña que el Congreso halló que existían."

*Por los fundamentos expuestos, se confirmará el dictamen del Tribunal Electoral de Puerto Rico.*

El Juez Asociado, Señor Angel M. Martín, concurre en el resultado sin opinión.