PARTIDO SOCIALISTA PUERTORRIQUEÑO, apelado, *v.* JULIO CÉSAR PÉREZ, SECRETARIO DE HACIENDA; GERINELDO BARRETO PÉREZ, ADMINISTRADOR DE LA COMISIÓN ELECTORAL; y su sucesora en cargo, agentes y/o empleados, apelantes.

*Número:* O-80-563     *Resuelto:* 21 de octubre de 1980

*Miguel A. Pagán, Eunice Sein Llompart* y *José A. Carlo,* abogados del Administrador General de Elecciones y de la Comisión Estatal de Elecciones; *Héctor A. Colón Cruz, Procurador General, Américo Serra, Procurador General Auxiliar,* y *Yusif Mafuz Blanco, Fiscal Auxiliar,* abogados del Secretario de Hacienda; *Raúl M. Olmo Olmo* y *Héctor M. Collazo,* abogados del Partido Socialista Puertorriqueño.

---

SENTENCIA

Vistas las mociones de reconsideración, original y suplementarias, presentadas por la parte apelante, el Tribunal las declara sin lugar, pero ordena la devolución de los fondos consignados en la Secretaría de este foro.

Estudiados los autos originales del presente caso, así como los alegatos presentados por las partes, se confirma la sentencia del Tribunal Superior. Se emitirá opinión formal oportunamente. Los Jueces se reservan el derecho de expresarse individualmente.

Así lo pronunció y manda el Tribunal y certifica el señor Secretario. Los Jueces Asociados Señores Rigau y Martín no intervinieron.

(Fdo.) Ernesto L. Chiesa

*Secretario*

—O—

Opinión concurrente del Juez Asociado Señor Negrón García, a la cual se unen los Jueces Asociados Señores Dávila e Irizarry Yunqué.

San Juan, Puerto Rico, a 24 de octubre de 1980

Nuestra Constitución visualiza el concepto de igualdad como un ideal dinámico capaz de proyectarse en distintas dimensiones. Este recurso exige su examen con referencia a la distribución del subsidio electoral gubernamental ante los reclamos de un partido político minoritario.

## I

El Partido Socialista Puertorriqueño (P.S.P.) quedó inscrito como partido por petición en febrero de 1980. El 7 de agosto de 1980, la Comisión Estatal de Elecciones —conforme al Art. 3.017 de la Ley Electoral de Puerto Rico— (¹) certificó

---

(¹) Núm. 4 de 20 de diciembre de 1977 según enmendada, 16 L.P.R.A.

al Secretario de Hacienda el cómputo correspondiente al adelanto del crédito adicional de los partidos políticos que comparecerán ante el electorado el próximo 4 de noviembre. El cálculo fue hecho siguiendo fielmente la guía estatutaria, esto es, en cuanto a los tres partidos principales, Partido Nuevo Progresista (P.N.P.), Partido Popular Democrático (P.P.D.), Partido Independentista Puertorriqueño (P.I.P.), tomando como base los votos obtenidos en las elecciones generales de 1976, y respecto al P.S.P., utilizando las peticiones de inscripción. Como consecuencia, se efectuó esta distribución:

|          | *Votos* | *Cantidad* |
|----------|--------|-----------|
| (P.N.P.) | 682,607 | $358,368 |
| (P.P.D.) | 634,941 | $333,344 |
| (P.I.P.) | 58,556 | $ 30,742 |
| (P.S.P.) |        | $ 38,273. |

Al tener conocimiento de esa repartición, el P.S.P. radicó ante el Tribunal Superior, Sala de San Juan, una petición de interdicto provisional y sentencia declaratoria, en solicitud de que se decretara la inconstitucionalidad de los ". . . [a]rtículos 3.017 y 3.019 de la Ley Electoral de Puerto Rico en tanto y en cuanto discriminan contra el Partido Socialista Puertorriqueño y el Partido Independentista Puertorriqueño en la distribución del Fondo Electoral; y que se le ordene a los demandados, y en particular al Secretario de Hacienda, Hon. Julio César Pérez, que distribuya el Crédito Adicional dispuesto en los Artículos 3.017 y 3.019 en partes iguales entre todos los partidos políticos". Alegó violación de la cláusula de igual protección de las leyes, consagrada en nuestra Constitución.

---

sec. 3117 *et seq.* Este cómputo era hasta el 31 de julio. Sería revisado para atemperarlo al número final de electores en el Registro del Cuerpo Electoral resultante de la última inscripción celebrada el 15 de septiembre de 1980.

El Administrador General de Elecciones compareció a oponerse. Levantó como defensa que la jurisdicción primaria residía exclusivamente en la Junta Revisora Electoral y que la petición no exponía hechos suficientes justificativos de la concesión de un remedio. Previa vista, la sala de instancia dictó sentencia que sostuvo la constitucionalidad del Art. 3.019,(²) pero con referencia al Art. 3.017 resolvió que era "constitucionalmente impermisible el sistema mediante el cual se le conceder[ían] . . ." tales adelantos al P.N.P. y P.P.D., en contraste con el P.I.P. y el P.S.P. A tales efectos, ordenó al Secretario de Hacienda y al Administrador General de Elecciones procedieran a distribuir el crédito adicional fijado en dicho Art. 3.017 ". . . en partes iguales entre todos los partidos políticos que participarán en las elecciones generales a celebrarse el día 4 de noviembre de 1980".

No conforme, en alzada los demandados apelantes reproducen sus defensas de falta de jurisdicción y desestimación, y para sostener que el tribunal incidió en error al declarar inconstitucional el Art. 3.017, aducen lo siguiente: que ello es facultad exclusiva de este Tribunal; que no aplicó la doctrina de incuria; que no reconoció que se trataba de un pleito

---

(²) 16 L.P.R.A. sec. 3119. Contempla la concesión de un crédito por la transportación de electores el día de las elecciones, dividiendo la suma de cuatrocientos mil (400,000) dólares entre todos los partidos políticos y candidatos independientes, a base del por ciento total de votos que los candidatos independientes obtengan en las elecciones generales de dicho año. Se reconoce que antes de las elecciones cada partido tendrá un crédito básico de veinticinco mil (25,000) dólares para gastos de transportación de electores en vehículos el día de las elecciones.

Sobre el particular, el tribunal correctamente concluyó:

"El propósito de esta disposición es uno particular y específico; ayudar a los partidos políticos a costear los servicios de transportar a los colegios de votación a los electores el día de las elecciones. Este propósito está *íntimamente relacionado con el por ciento de apoyo electoral que reciba cada partido ya que es lógico suponer que cada partido incurrirá en gastos al transportar a sus electores en proporción al número de electores que lo respalden en la elección general.* El día de las elecciones todos los partidos estarán en igualdad de condiciones para costear los gastos de transportación, pues a todos se les concede la misma cantidad: $28,000.00." (Bastardillas nuestras.)

político; que el artículo era válido de su faz; y que apreció equivocadamente la única prueba testifical desfilada consistente del testimonio del Lcdo. Carlos Gallisá.

## II

Antes de considerar el apuntamiento central sobre constitucionalidad, es imprescindible que nos concentremos en los aspectos preliminares antes relacionados. Veamos.

### A. *Las Defensas de Falta de Jurisdicción e Incuria*

La primera descansa en la proposición de que la Junta Revisora Electoral tiene "jurisdicción primaria en el caso de epígrafe". Dos razones de peso derrotan esta contención. *Primeramente,* del examen del estatuto creador de la Comisión Estatal de Elecciones y de la Junta Revisora Electoral no se desprende que se haya conferido tal jurisdicción primaria exclusiva. Y *segundo,* independientemente de ello, como acertadamente decidió el tribunal a quo —con apoyo en nuestras decisiones de *Otero Martínez* v. *Gobernador,* 106 D.P.R. 552, 556 (1977), *Febres* v. *Feijoó,* 106 D.P.R. 676, 681 (1978), *Pierson Muller I* v. *Feijoó,* 106 D.P.R. 838, 851 (1978) y *Pedraza Rivera* v. *Collazo Collazo,* 108 D.P.R. 272 (1979)— la intervención del foro judicial no está subordinada a normas de jurisdicción primaria y agotamiento de la esfera administrativa, cuando concurren los siguientes factores: (a) existe un reclamo sustancial de que la actuación administrativa lesiona derechos constitucionales de una parte; (b) se puede trazar la línea y distinguir entre situaciones de interpretación estatutaria y constitucionales en que la competencia y destreza del foro judicial es evidente, y aquellos en que se manifiesta la especialidad o pericia (*expertise*) acumulativa; y (c) se puede tornar en ilusorio y académico el derecho reclamado.

Tampoco resulta de aplicación, en las circunstancias de autos, la doctrina de incuria. No fue hasta agosto de este año en que se adoptó la determinación administrativa y se

hizo el cómputo oficial de distribución. Fue entonces que para el P.S.P. se materializó realmente y se puso de manifiesto la diferencia abismal económica dimanante del Art. 3.017 e inmediatamente radicó esta acción.

B. *El Poder del Tribunal de Instancia para Decretar la Inconstitucionalidad y la Norma de Hermenéutica*

Los apelantes aducen que el tribunal de instancia carecía de autoridad para dictaminar la inconstitucionalidad del precepto envuelto. Predican este argumento señalando ". . . que el único tribunal en el Estado Libre Asociado de Puerto Rico que tiene facultad legal para declarar inconstitucional una Ley es el Honorable Tribunal Supremo por mayoría de los Jueces de que esté compuesto dicho Tribunal y no una Sala del Honorable Tribunal Superior o de Distrito".

El planteamiento es improcedente. La Sec. 4 del Art. V de nuestra Constitución —preceptivo de que "ninguna ley se declarará inconstitucional a no ser por una mayoría del número total de los jueces de que esté compuesto el Tribunal de acuerdo con esta Constitución o con la Ley"— no tiene el alcance que en este aspecto se pretende. Existe en el legajo de la Asamblea Constituyente evidencia clara de que dicha norma no pretendía privar a los tribunales de instancia de la facultad tradicional de decretar la inconstitucionalidad de un estatuto. Allí, en las deliberaciones, el delegado Sr. Ramos Antonini dejó constancia expresa "respecto del poder de otros tribunales para declarar anticonstitucional o inconstitucional una ley", y el delegado señor J. Benítez puntualizó ". . . que la potestad de declarar una ley contraria a la constitución *es una potestad consubstancial con el ejercicio de la judicatura y que no está reservada en exclusividad al Tribunal Supremo* nada más que en la medida en que, claro, siendo el Tribunal Supremo el tribunal de última instancia, será su juicio el que en definitiva gobierne la situación . . .". *Diario de Sesiones de la Convención Constituyente*, Ed. Equity, 1961, pág. 1639.

En suma, debe despejarse toda duda al respecto. El criterio de mayoría absoluta en la mecánica de votación de este Tribunal no significa ni implica que priva a los de instancia de facultad para atender válidamente, en la esfera de su competencia, reclamos de esta envergadura. *Dichos foros tienen autoridad para decretar la inconstitucionalidad de una ley.* Si ninguna de las partes ni el Estado apelan y el dictamen adviene en final y firme, será ejecutorio en cuanto a esos contendientes. En este aspecto, tal pronunciamiento es de índole *limitada e "inter se".* Salvo su carácter persuasivo, otros tribunales de igual jerarquía no vendrían obligados por dicho pronunciamiento. Ahora bien, este ámbito limitado desaparece, de apelarse y confirmar este Tribunal la inconstitucionalidad del estatuto en cuestión. Entonces dicha ley se convierte en letra muerta. ¿Qué sucede? "[D]esde ese momento ante el intento de cualquiera que pretendiera exigir cumplimiento de cualquiera de esas leyes que el propio Tribunal Supremo ha declarado nulas[, q]ueda cerrado todo. No existe. Ese es el resultado." *Diario de Sesiones*, pág. 1647.

Íntimamente relacionado con este apuntamiento es menester aclarar el principio de hermenéutica aplicado por el tribunal de instancia. Aunque "declara que el artículo 3.017 de la Ley Electoral de Puerto Rico es inconstitucional", ciertamente se trata de un simple error de forma inconsecuente. Obviamente no podría subsistir tal decreto con el remedio concedido, por resultar ambos contradictorios. Si el precepto de ley es inconstitucional, ¿de qué fuente legal surgirá dicho mandato de paridad económica? El haber ordenado prorratear tales fondos con absoluta igualdad matemática representa la opción que, a juicio de dicho foro, es más compatible y afín con el propósito de la Asamblea Legislativa.

Por todos es conocida la doctrina de que si un estatuto puede ser interpretado de dos formas —tanto constitucional como inconstitucional—, los tribunales deben propiciar y optar por lo primero y sostenerlo. *Pueblo* v. *Andújar,* 80

D.P.R. 822, 825–826 (1958); *Martínez v. Tribunal Superior,* 81 D.P.R. 945, 953 (1960). A tono con este derrotero, y en materia estatutaria de índole discriminatoria, se ha desarrollado el siguiente enfoque:

Cuando un estatuto es defectuoso por exclusión existen dos alternativas remediales: un tribunal puede declarar su nulidad y ordenar que sus beneficios no sean extendidos a la clase que la legislatura pretendió beneficiar o extender la cobertura del estatuto para incluir aquellos perjudicados con la exclusión. Opinión concurrente del Juez Harlan en *Welsh v. United States,* 398 U.S. 333, 361 (1970).

El criterio rector para determinar si se invalidará o no la ley en cuestión es explorar, detectar y precisar la intención legislativa y bajo cuál de esas alternativas se respeta más la misma.

### C. *Naturaleza de la Controversia y Apreciación de la Prueba*

Por último, nos referimos a los planteamientos referentes a que erró el tribunal sentenciador al no concluir que este pleito era de índole política y tenía fines políticos —según admisión del propio testigo de la parte demandante, Lcdo. Carlos Gallisá— y al apreciar equivocadamente la prueba. Ambos son infundados.

El carácter del pleito —de consecuencias y móviles políticos— no desvirtúa la naturaleza eminentemente justiciable de la controversia y la cualidad jurídica de los remedios invocados, a saber, la constitucionalidad de una distribución desigual de fondos entre partidos políticos. *P.S.P., P.P.D., P.I.P. v. Romero Barceló,* 110 D.P.R. 248 (1980); *Ortiz Angleró v. Barreto Pérez,* 110 D.P.R. 84 (1980); *Santa Aponte v. Srio. del Senado,* 105 D.P.R. 750 (1977).

La sala de instancia, dentro de los límites de su arbitrio, aquilató correctamente la prueba testifical. Por no haberse justificado, no habremos de intervenir con dicha función.

## III

Resueltas estas cuestiones preliminares y despejada la vía procesal, dirijimos nuestra atención a la médula del recurso: la validez del Art. 3.017.

A manera de *introito*, este precepto forma parte integral del esquema financiero legislativo trazado para lograr paridad económica entre los partidos políticos del país. Este plan fue originalmente descrito en la Asamblea Constituyente por el delegado Sr. Padrón Rivera, quien abogó por el día en que "si queremos unas elecciones fundamentalmente democráticas —tenemos que llegar a la conclusión de que los partidos políticos deben ponerse en un mismo nivel de potencialidad económica para que los candidatos tengan la misma oportunidad de llegar al poder .... Y el Estado debe tener la obligación de poner en las mismas condiciones económicas a todos los candidatos para que el proceso electoral entrañe puramente, el principio democrático". *Diario de Sesiones*, pág. 1401. Aunque este deseo no alcanzó linaje constitucional, posteriormente, en virtud de la Ley Núm. 110 del 30 de junio de 1957 —hoy derogada— tuvo alumbramiento estatutario. A tono con esta concepción, hoy en día la Ley Electoral reconoce a los partidos el derecho a participar en un Fondo Electoral que les provee a cada uno, en años no eleccionarios, la cantidad máxima de $100,000 y, en año de elecciones, $200,000. El uso autorizado de esos dineros es abarcador, para beneficio de los candidatos postulados y todo gasto administrativo "de campaña y propaganda política" razonablemente concebible y necesario. Arts. 3.016 y 3.018 (16 L.P.R.A. secs. 3116 y 3118).

De una lectura del Art. 3.016 observamos que se clasifica y trata a todos los partidos políticos por igual, ello independientemente de que sean denominados "principales o por petición". Sin embargo, en contraste, notamos que el Art. 3.017 [3]

---

[3] Reza:

"(a) Crédito Adicional: En año de elecciones generales existirá **un**

establece: (1) un crédito adicional desigual que se les anticipa a todos los partidos; (2) que éste se evalúa "a base de un crédito de setenta y cinco (75) centavos por elector que figure en el Registro del Cuerpo Electoral"; y (3) que se adjudica y distribuye —en cuanto a los partidos principales— de acuerdo con los votos obtenidos en la última elección, y respecto a los partidos por petición, a base de las peticiones que presentó al inscribirse.

En *P.N.P.* v. *Tribunal Electoral,* 104 D.P.R. 741, 750–751 (1976) —al analizar las premisas legislativas que inspiraron la génesis del "Fondo Electoral, el cual provee a todos los partidos políticos principales y por petición, irrespectivamente de las prédicas e ideologías promulgadas, una capacidad económica inicial e igualitaria para la divulgación de ideas y mensajes en nuestro país"— reconocimos los siguientes principios: (a) "[n]uestro sistema de gobierno democrá-

crédito adicional, que será la cantidad que resulte a base de un crédito de setenta y cinco (75) centavos por elector que figure en el Registro del Cuerpo Electoral. Dicha cantidad se prorrateará entre los partidos políticos y los candidatos independientes, a base del por ciento del total de votos que los candidatos a Gobernador de los partidos políticos y los candidatos independientes obtengan en las elecciones generales de dicho año.

"(b) Adelanto del Crédito Adicional: Inmediatamente después de cerrado el Registro del Cuerpo Electoral, la Comisión Electoral certificará al Secretario de Hacienda el número de electores inscritos en dicho Registro para cada elección general.

"El Secretario de Hacienda multiplicará el crédito por elector, dispuesto en el inciso (a), por el número de electores que obtuvo cada partido en las elecciones generales precedentes, según la certificación de la Comisión Electoral al respecto.

"Cada partido político principal tendrá derecho a recibir como anticipo hasta el setenta (70) por ciento de la cantidad así estimada. Cada partido político por petición recibirá como anticipo, con cargo a la asignación dispuesta en el inciso (a) el setenta (70) por ciento de la cantidad que resulte, multiplicando el número de electores que necesitaría para acogerse a los beneficios del Fondo Electoral por la cantidad que correspondería por cada elector según se establece en el inciso (a) de esta sección.

"(c) Reajuste Final: Luego de certificado el resultado de las elecciones, la Comisión Electoral ajustará los estimados a los resultados de las mismas, conforme el inciso (a) anterior, y ordenará al Secretario de Hacienda que proceda a pagar o recobrar las cantidades correspondientes, según fuere el caso."

tico se nutre del proceso político para elegir aquellos que representan al pueblo, reconociendo el derecho de los ciudadanos a organizarse en grupos de opinión con carácter de partidos políticos y proponer candidatos de su predilección . . . ."; (b) "[a]nte los adelantos técnicos de comunicación rápida, directa y masiva, el libre intercambio y la fluidez de ideas y la discusión en torno a los asuntos públicos y las cualificaciones de los candidatos, *dependen en gran medida de la capacidad económica de éstos y los partidos políticos"*; (c) "[e]l mensaje personal de antaño en las lides electorales puertorriqueñas es hoy la excepción, descansándose cada vez más en los medios electrónicos de difusión moderna. Ante este fenómeno, y el costo que ello exige, las contribuciones del ciudadano a sus respectivos partidos políticos son vitales para el desenvolvimiento y desarrollo del proceso democrático"; (d) "[a]un cuando no existe una correlación entre los resultados electorales y la capacidad económica de un partido político o candidato —ya que en adición entran en juego un sinnúmero de factores tales como naturaleza de las controversias, organización, liderazgo, destreza, prestigio, control y extensión de información y publicidad— *las contribuciones económicas y por ende, la solvencia de los partidos políticos afectan positiva o negativamente y en gran medida los factores mencionados y por ende el desenlace final"; y* (e) "[e]stimamos que en el contexto constitucional expuesto, son cognoscibles, como objetivos legítimos consustanciales al proceso democrático, *medidas razonables tendentes a disminuir las diferencias económicas y ventajas entre los partidos y candidatos por razón de desigualdades en riqueza,* a la par que evitar contribuciones cuantiosas e irrestrictas que pudieran comprometer el curso ulterior del gobierno en orden a influencias indebidas o favoritismos por razón de tales aportaciones." (Bastardillas nuestras.)

Estos principios rigen la solución del caso de autos. Adicionalmente, tratándose de una clasificación legislativa que

toca íntimamente el ámbito político operacional y afecta los derechos de todos los electores miembros de un partido, fácil es captar que la misma resulta sospechosa y se impone un estricto escrutinio judicial. En consecuencia, el Estado tiene el peso de demostrar que existe un interés apremiante que beneficia y justifica el interés común y hace necesaria tal clasificación. *Zachry International* v. *Tribunal Superior*, 104 D.P.R. 267 (1975); *Com. Asuntos de la Mujer* v. *Srio. de Justicia*, 109 D.P.R. 715 (1980).

Bajo este enfoque, el Estado ha fallado en cumplir esa misión. Su único argumento de peso —la legitimidad de establecer "como criterio para la utilización de fondos públicos . . . el respaldo o patrocinio público del electorado a dichos partidos"— cae ante "el axioma básico que fluye en [la propia Ley] Electoral de que el proceso político decisional puertorriqueño responda en su realidad al mandato de *igualdad* consagrado en nuestra Ley Fundamental". (Énfasis suplido.) *P.N.P.* v. *Tribunal Electoral*, supra, pág. 753. ¿Cómo se puede cumplir con ese propósito si la ley habilitadora que autoriza el diseño económico de subsidio electoral reparte entre los dos partidos mayoritarios principales parte sustancial de los fondos y permite que los partidos minoritarios independentistas reciban sumas exiguas de fondos en comparación con aquéllos? Admitimos que para fines de computar y lograr obtener o retener una franquicia electoral resulta legítimo el criterio de endoso o patrocinio de votantes. Actualmente existe un nexo de racionalidad y lógica entre ambos factores. Sin embargo, no podemos decir lo mismo sobre la distribución de fondos públicos destinados para un mismo propósito legislativo, a saber, "gastos de campaña y propaganda política". Para este fin no existe vínculo racional justificativo del trato desigual, pues *todos* los partidos intentan alcanzar y llevar a través de la comunicación y otros medios sus ideas, plataformas, programas y alternativas *a todos los electores del país.* ¿O es que porque algunos sean minoría, se

espera que limiten sus campañas a sus adeptos reconocidos o a determinadas áreas geográficas? Recuérdese que una hora de transmisión por la televisión le cuesta al P.S.P. lo mismo que a las otras colectividades políticas. Es de esperarse que así también ocurra con otros servicios análogos. Si algún partido puede obtener alguna economía o reducción en la obtención de tales servicios o de materiales, son aquellos que tienen mayor poder adquisitivo y de regateo, en virtud de una fuerza económica superior.

Cuando hablamos de igualdad económica, aplica con todo rigor la noción de equivalencia aritmética. Percibimos que de prevalecer el diseño actual estatutario de disimilitud monetaria, se estaría derrotando el propósito legislativo por conceder precisamente subsidios gubernamentales superiores y cuantiosos a quienes, en un sentido, menos lo necesitan. Por contar con endosos mayoritarios, los partidos principales reciben contribuciones individuales en número considerable. Anotamos que el criterio cuantitativo establecido en el Art. 3.017 es contrario y niega el propósito legislativo. Tiende a perpetuar la disparidad económica, y crea un círculo vicioso difícil de superar.

Contra esta conclusión no es oponible *Buckley* v. *Valeo*, 424 U.S. 1 (1976). De correcta juridicidad estimamos el análisis de la ilustrada sala sentenciadora de que el pronunciamiento del Tribunal Supremo federal en dicho caso —en el sentido de se puede justificar lícitamente a base del patrocinio electoral un trato diferente económico contra candidatos minoritarios— no es de aplicación ni determina al de autos. Varias razones se imponen, a saber: (1) la Ley Electoral vigente no distingue, en esencia, entre partidos mayoritarios y minoritarios; (2) en muchas áreas, nuestra realidad política es sustancialmente diferente de la norteamericana; en particular, la peculiaridad única en el debate político del tema, a veces principal y otras secundario, sobre la posible redefinición o modificación de las relaciones con los Estados

Unidos: *P.P.D.* v. *Ferré, Gobernador*, 98 D.P.R. 338 (1970) ; (3) distinto a la jurisdicción federal, en Puerto Rico la Constitución expresamente consagra y encomienda una labor de fiscalización a los partidos minoritarios, reconociéndoles representación legislativa: Art. III, Sec. 7, *Diario de Sesiones*, págs. 2594–2596; (4) no existe en Puerto Rico un interés gubernamental básico que promueva un sistema a favor de dos partidos, tal y como sucede en los Estados Unidos con el Demócrata y el Republicano; y (5) ciertamente es difícil aceptar como justificación para negar igualdad económica, que exista un interés del Estado tendente a suprimir los partidos minoritarios: Tribe, *American Constitutional Law*, The Foundation Press, Inc., 1978, págs. 810–811.

Recapitulando, reconocida y conferida la franquicia electoral a un grupo de ciudadanos —partido político— no puede sostenerse un trato desigual en materia de ayuda económica gubernamental. Desde esta perspectiva, el mencionado Art. 3.017 es discriminatorio por entorpecer la máxima expresión del derecho colectivo e individual del sufragio e infringir la cláusula de igual protección de las leyes. Ante la alternativa de anular *in toto* su texto, mediante interpretación, optamos por alcanzar la meta legislativa, y logramos mejor sus propósitos, siguiendo el patrón estatutario de los restantes preceptos. Por ende, procede que mantengamos su eficacia confirmando el dictamen del tribunal sentenciador, que ordenó la equitativa distribución, por igual, entre todos los partidos políticos.

## IV

Sobre el particular, es menester apuntar que el Secretario de Hacienda nos certificó que de la participación correspondiente al Art. 3.017 de la Ley Electoral, "el 70% de los Fondos Electorales disponibles asciende a $840,000.00 de los cuales, a la fecha de hoy, se ha satisfecho a los Partidos Políticos de Puerto Rico la suma total de $497,683.00, quedando un sobrante disponible para distribución equitativa

entre dichos Partidos Políticos ascendentes a $458,014.00". Nos indica, además, que el Partido Popular Democrático agotó su participación y adeuda al Tesoro Estatal la suma de $115,697. Lo expuesto no debe ser óbice para que se cumpla con el mandato judicial de distribución equitativa entre los partidos políticos, de la suma original de $840,000. Cualquier deuda que el Partido Popular Democrático u otro tuviera al presente, podrá ser recobrada mediante cualesquiera sumas que en virtud de cualquier otra disposición de la Ley Electoral, al presente o con posterioridad a las elecciones, fuera acreedor. Por tal razón, con anterioridad dispusimos la devolución del dinero consignado ante este Tribunal al Secretario de Hacienda.

Sea prédica de orientación liberal, conservadora, marxista o de otra índole —de ideología estadista, autonomista o independentista— la levadura que hace crecer nuestro sistema democrático es el libre intercambio y el choque pacífico de ideas. La igual oportunidad económica para diseminarlas es requisito indispensable y consustancial a ese postulado.