CARIBBEAN INTERNATIONAL NEWS CORP. h/n/c EL VOCERO DE PUERTO RICO, demandante y recurrido, *v.* COMISIÓN ESTATAL DE ELECCIONES ET ALS., demandados y recurrentes.

Números: RE-92-480  Resueltos: 20 de noviembre de 1992
RE-92-483

*David Rivé Rivera* y *José R. Lebrón Velázquez*, abogados de los recurrentes; *Miguel A. Hernández Agosto, pro se.*

## RESOLUCIÓN

Se ordena la consolidación de los recursos RE-92-480 y RE-92-483.

A las anteriores solicitudes de revisión, *no ha lugar.*

Lo acordó el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Negrón García emitió una opinión concurrente. El Juez Asociado Señor Rebollo López, "por entender que los dos recursos radicados plantean cuestiones importantes de derecho que este Tribunal debe considerar, y a los fines de establecer la norma de derecho que debe regir respecto a esta situación en esta jurisdicción, expediría". El Juez Asociado Señor Fuster Berlingeri no intervino.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

1

## — O —

Opinión concurrente del Juez Asociado Señor Negrón García.

I

Ante el Tribunal Superior, Sala de San Juan, por un camino largo y tortuoso, ha prevalecido *El Vocero de Puerto Rico* en su reclamo de justicia para que la Comisión Estatal de Elecciones (en adelante Comisión Estatal) cumpla con el deber ministerial impuesto claramente en el Art. 4.001 de la Ley Electoral de Puerto Rico (en adelante Ley Electoral), 16 L.P.R.A. sec. 3151(a), de exigirle a los candidatos electos a los cargos de senador, representante y alcalde que sus respectivos estados de situación financiera sean "certificado[s] por un contador público autorizado" (C.P.A.).[1] Así lo resolvió el Hon. Juez Arnaldo López Rodríguez, quien el 15 de septiembre de 1992 anuló por *ultra vires* el reglamento aprobado por la Comisión Estatal el 4 de enero de 1988 (sobre *Contenido mínimo de los estados de situación de los candidatos a elección*). Ese dictamen coincide con nuestro disenso del pasado 2 de junio en el Recurso Núm. MD-92-10 (instado directamente ante nos), *El Vocero v. C.E.E.*, 130 D.P.R. 525 (1992). Si en este tipo de situación el Poder Judicial no pone en vigor *eficazmente* la Ley Electoral, ¿quién lo hará? Ciertamente no podemos esperarlo de los partidos políticos principales, acostumbrados al ambiente y tratamiento típico de una *partidocracia*

---

[1] Dispone:

"(a) Todo candidato en una elección *deberá radicar en la Comisión su estado de situación, certificado por un contador público autorizado, junto con el juramento de su aceptación de la nominación para figurar en una elección.* En el caso de los candidatos a asambleístas municipales, podrá hacerse dicho estado de situación mediante declaración jurada ante funcionario autorizado a tomar juramentos. La Comisión no aceptará ni radicará la nominación si el candidato violare esta disposición. La Comisión establecerá mediante reglamento el contenido mínimo de los estados de situación." (Énfasis suplido.) Art. 4.001 de la *Ley Electoral de Puerto Rico*, 16 L.P.R.A. sec. 3151(a).

que, "como su nombre ya lo señala, consiste en el gobierno de partidos, por partidos y para partidos". J.F. Segovia, *La partidocracia y el futuro de la democracia*, CIV Rev. El Derecho 915, 916 (1983).

## II

La renuencia de la Comisión Estatal a cumplir con la Ley Electoral es inexplicable. Sus dos señalamientos de error en el Recurso Núm. RE-92-480 (cuestionar la legitimación activa de *El Vocero de Puerto Rico* y la facultad judicial para ordenarle, por excepción, incurrir en unos gastos, según el alegato de que no existe partida presupuestaria ni autorización de ley) simplemente constituyen un recital de argumentos forenses desgastados. Veamos.

En *primer* lugar, se trata de un periódico que constitucionalmente tiene "un interés legítimo", atado inexorablemente a la *legitimación activa* que posee fundada en su razón de ser y función. *Negársela es negar su propia existencia.* "En la esfera política, los medios informativos han sido llamados con propiedad 'la cuarta rama del gobierno', nombre que describe la función del periodismo como guardián fiel y motivador de las otras tres ramas. El medio tiene poder e influencia en las esferas sociales, políticas y económicas de la sociedad." L. Brown, *Responsabilidad Social de la Prensa*, Méjico, Eds. Asociados, 1977, pág. 9. Aun con todas las imperfecciones de esos medios de comunicación, en una democracia la publicidad tiende a garantizar posteriormente un control constructivo sobre la obra gubernamental, incluso la administración de justicia; sobre todo, fomenta su credibilidad. *Soto v. Srio. de Justicia*, 112 D.P.R. 477 (1982). La característica medular del periodismo moderno es su dinamismo: noticia del momento, actualizada y procesada instantáneamente por medio de la televisión, radio y, en cierta medida, la prensa diaria escrita. *El Vocero de P.R. v. E.L.A.*, 131 D.P.R. 356 (1992), opinión disidente. (Énfasis suplido, en el original y escolio omitido.) *Sol. Examen Inf. Div. Fin. J. Campoamor*, 131 D.P.R. 1002, 1003–1004 (1992), voto disidente.

Lo expuesto dispone adecuadamente del planteamiento sobre legitimación activa. Incidentalmente, la contención de que *El Vocero de Puerto Rico* no demostró daño pasa por alto que "bajo el palio constitucional de libertad de prensa y expresión, y en el descargo de su legítima función de-

mantener a la ciudadanía informada sobre los asuntos oficiales de gobierno, tiene derecho de acceso y a que la información financiera sea *confiable* según lo dispone el Art. 4.001 ...". (Énfasis suplido.) *El Vocero v. C.E.E.*, supra, pág. 529.

Hacemos hincapié en que la *veracidad* de la información y de la noticia es el elemento ético-social en que se apuntala el derecho de la prensa, consustancialmente con la libertad de información en sus vertientes *activa* (derecho de informar) y *pasiva* (derecho a ser informado). A fin de cuentas, no podemos reducir el derecho a la libre expresión a simplemente un potencial, esto es, la "posibilidad" de opinar o expresarse libremente.

Acentuamos que en una verdadera democracia, el derecho a la libre expresión es la *infraestructura* de todos los derechos. Por su efecto multiplicador, significa "(1) el *derecho a los hechos*, que supone el amplio acceso a la información; (2) el *derecho a los juicios*, que supone la posibilidad de emitir una valoración sobre los hechos; (3) el *derecho a comunicar libremente*, que significa la libre transmisión de los hechos y de los juicios; (4) el *derecho a la discusión pública*, o sea, la posibilidad de amplio debate de las ideas, los hechos y los juicios; y (5) el *derecho a manifestar*, a través del ejercicio de la libertad de reunión, circulación, etc.". J.R. Vanossi, *No a la censura*, XLI (Núms. 101–102) Estudios de Derecho 27 (1982). Véase, además, T.B. Dyk, *Newsgathering, Press Access, and the First Amendment*, 45 Stan. L. Rev. 927 (1992).

Eximir a los candidatos de la certificación exigida por la Ley Electoral representa una limitación sustancial al acceso de información sobre un asunto vital de buen gobierno. Como razonó el ilustrado foro sentenciador, "dicho reglamento merma en calidad [y] cantidad la información pública de gobierno que exige [l]a Ley Electoral, lo que constituye una violación al derech[o] de libertad de prensa al ello acarrear que no se le pueda llevar al pueblo *toda* la

información pública sobre las finanzas de los candidatos a elección. Somos de opinión que de ser así, el daño a la prensa es palpable y directo". (Énfasis suplido.) Caso Núm. RE-92-480, Apéndice, pág. 28.

El segundo señalamiento de la Comisión Estatal carece de mérito. Impugna el remedio pautado así por el foro de instancia:

> También somos consciente[s] de que podría resultar que *algún* candidato no cuente con los recursos económicos para pagar los honorarios del CPA por la preparación de un estado de situación auditado. *En tal situación correspondería a la CEE examinar caso por caso y comprobado fehacientemente la condición de indigencia de un candidato a los fines de poder costear su estado proceder la Comisión al pago del mismo.* Al igual que no se puede limitar el acceso a los tribunales de justicia a una persona por razón de su condición económica o sea, por ser indigente, tampoco en un sistema democrático de gobierno se le puede impedir a un ciudadano que compita para un cargo electivo por razón de éste no poder costear uno de los requisitos dispuestos por ley para cualificar como candidato. (Énfasis suplido.) Caso Núm. RE-92-480, Apéndice, págs. 38–39.

La Comisión Estatal arguye que ello es contrario al Art. VI, Sec. 9 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 369 —"[s]ólo se dispondrá de las propiedades y fondos públicos para fines públicos y para el sostenimiento y funcionamiento de las instituciones del Estado, y en todo caso por autoridad de ley"— y además, que el Art. 8 de la Ley Orgánica de la Oficina de Presupuesto y Gerencia, Ley Núm. 147 de 18 de junio de 1980 (23 L.P.R.A. sec. 108) le prohíbe hacer erogaciones sin autorización o en exceso del cincuenta por ciento (50%) de fondos, lo cual tipifica como delito menos grave. Insiste que se trata de un gasto no presupuestado.

El planteamiento soslaya que la Comisión Estatal es el organismo rector responsable de todo lo concerniente a los procedimientos de naturaleza electoral, entre ellos cumplir el mandato legislativo en torno a los estados de situación financiera de los candidatos. En el descargo de esa enco-

mienda, su Presidente está expresamente autorizado a contratar los servicios profesionales y técnicos necesarios —Art. 1.011 de la Ley Electoral, 16 L.P.R.A. sec. 3007(A)(d)— y a aprobar los desembolsos que a tal efecto sean necesarios contra el presupuesto funcional.

Argumentar que el pago de los honorarios del C.P.A. de alguno que otro candidato es delito por no estar expresamente presupuestado equivale a ignorar la dinámica de funcionalidad inherente en todo presupuesto. Más aún, es declararse culpable de haber cumplido con el deber de celebrar las elecciones el martes 3 de noviembre, aun cuando dicho organismo reconoció públicamente que carecía de fondos suficientes. Tomamos *conocimiento judicial* de que al presente la Comisión Estatal está solicitando una asignación presupuestaria al efecto.

El remedio del tribunal sentenciador es de excepción, fundado en equidad, para subsanar una situación peculiar. Está ampliamente justificado. La fiscalía y la auditoría de las finanzas de los candidatos electos a puestos políticos *es un fin público* que el Estado puede constitucionalmente financiar bajo la elástica jurisprudencia que ha pautado la mayoría de este Tribunal durante los últimos años. ¿No lo hace con los maestros, a quienes sin enseñar en las aulas subsidia electoralmente pagándole sus sueldos desde el momento de ser candidatos certificados? *Berberena v. Echegoyen*, 128 D.P.R. 864 (1991). ¿No financia la celebración de unas primarias presidenciales "compulsorias", aun cuando no somos un estado federado, ni bajo el Estado Libre Asociado existe el derecho a votar por el Presidente de Estados Unidos? *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988).

Finalmente, nada obsta que ese remedio, por su naturaleza, sea librado contra el Fondo Electoral que tienen los partidos políticos "para beneficio de *todos* los candidatos postulados [y como] gastos administrativos de campaña". (Énfasis suplido.) Art. 3.026 de la Ley Electoral, 16 L.P.R.A. sec. 3118; Art. 3.021 de la Ley Electoral, 16

L.P.R.A. sec. 3114. Véase *P.N.P. v. Tribunal Electoral*, 104 D.P.R. 741 (1976).

### III

El Recurso Núm. RE-92-483 presentado por los candidatos electos del Partido Popular Democrático (P.P.D.) a los cargos de senador,[2] representante y alcalde, es improcedente en la medida en que levanta: la falta de legitimación activa de *El Vocero de Puerto Rico*; la invalidez del emplazamiento mediante edictos; la presunción de corrección del trámite administrativo; unos límites al derecho de acceso a la información; la improcedencia de la sentencia sumaria, y la inconstitucionalidad de la orden de que los electores sometan a la Comisión Estatal "estados de situación auditados como requisito *sine qua non* para poder ocupar sus cargos ..." Solicitud de revisión, pág. 3.

*Primero,* según expuesto, la legitimación activa de *El Vocero de Puerto Rico* es indiscutible. *Segundo*, aunque discrepamos, según las normas adoptadas por la mayoría en *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593 (1989), no erró el foro de instancia al ordenar que se les emplazara mediante edictos. Además, observamos que el tribunal asumió válidamente jurisdicción sobre la Comisión Estatal, organismo compelido a certificar a aquellos candidatos electos que cumplan con las exigencias de la Ley Electoral, que incluyen entre otras, someter sus informes financieros certificados por un C.P.A. *Tercero*, el respetable foro sentenciador acogió correctamente el recurso de *mandamus*. Hizo caso omiso del cauce administrativo, pues la negativa mayoritaria de 2 de junio a intervenir tansformó el trámite en uno urgente debido a la inminencia de los comicios

---

[2] Mediante *Moción Informativa* suscrita el 13 de noviembre de 1992 por derecho propio, el Lcdo. Miguel A. Hernández Agosto, en calidad de senador electo, informó que se proponía cumplir con la sentencia. Interpretamos su comparecencia como un desistimiento voluntario.

electorales. Además, la contención de *El Vocero de Puerto Rico* era adjudicable como una cuestión pura de derecho. Ante esta realidad, hubiese sido absurdo demorarlo más, remitiéndolo a la Comisión Estatal o celebrando una vista evidenciaria. *Cuarto*, pretender negarle acceso a *El Vocero de Puerto Rico* bajo la tesis de que la información no está en manos del Gobierno es negar que existe la obligación legal de los candidatos a proveerla. Precisamente, por no haberla exigido la Comisión Estatal es que dicha información no ha estado disponible. El argumento es circularmente defectuoso. Y, *finalmente*, no cabe ataque alguno al remedio del Tribunal Superior que ordene, como requisito *sine qua non* para tomar posesión, que rindan tales informes. Las sentencias de los tribunales no pueden convertirse en papel mojado, inservibles e inejecutables. Estamos obligados a velar y a exigir que se cumpla la ley. Así nos lo encomienda la Constitución. Si no lo hacemos, ¿quién lo hará? ¿Vamos con nuestra inercia a contribuir que se torne académico? Ya en el pasado, ante una crisis de acatamiento a un mandato judicial en un caso electoral, rechazamos abdicar nuestras prerrogativas constitucionales. En *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 538, 541 (1980) (caso "pavazos"), dispusimos que cualquier certificación de elección de candidatos a un puesto público por la entonces Comisión Estatal que no cumpliera con nuestra decisión o se desviara de la misma, "carecer[í]a de toda eficacia y ser[í]a nulo a todo efecto legal".

En *resumen*, relevar a los candidatos del cumplimiento de la Ley Electoral sería un mal comienzo para la democracia puertorriqueña en este nuevo cuatrienio. ¿Cómo pueden tomar posesión de sus cargos y jurar fidelidad a la Constitución y a las leyes del país —Art. VI, Sec. 16, Const. E.L.A., L.P.R.A., Tomo 1— si se niegan a acatarla?

Rechazamos reducir a escombros los principios de sana administración pública que la Asamblea Legislativa estimó justificativos para que los candidatos a elección revelen pú-

blicamente su condición financiera mediante un estado de situación *certificado* por un contador público autorizado. Una interpretación judicial en contrario sería un triunfo para la *partidocracia*, esto es, una "exacerbación valorativa del instrumento político de gobierno que es el partido; en la partidocracia el partido ha dejado de ser un medio, *es ya un fin en sí mismo*, o —en palabras de FERNÁNDEZ DE LA MORA— en la partidocracia lo accidental se ha transformado en sustancial y lo coyuntural en permanente". (Énfasis suplido y escolio omitido.) Segovia, *supra*, pág. 916.