EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Frente Unido Riograndeño Recurrido v. Comisión Estatal de Elecciones et al Peticionaria | Certiorari 2000 TSPR 50 |
|---|---|

Número del Caso: CC-1996-0466

Fecha: 24/03/2000

Tribunal de Circuito de Apelaciones: Circuito Regional I

Juez Ponente: Hon. Angel González Román

Abogado de la Parte Peticionaria:  Lcdo. David Rive Rivera

Abogados de la Parte Recurrida:     Lcdo. Arturo Nieves Huertas
                                    Lcdo. Felipe Cirino Colón

Abogado del Partido Independentista Puertorriqueño:

                                    Lcdo. Gilberto Concepción Suárez

Materia: Revisión Judicial

        Este documento constituye un documento oficial del Tribunal
        Supremo que está sujeto a los cambios y correciones del
        proceso de compilación y publicación oficial de las
        decisiones del Tribunal. Su distribución electrónica se hace
        como un servicio público a la comunidad.

**EN EL TRIBUNAL SUPREMO DE PUERTO RICO**

Frente Unido Riograndeño

    Demandante-recurrido

       v.                          CC-96-466      CERTIORARI

Comisión Estatal de Elecciones
Et Al

    Demandado-peticionaria


**SENTENCIA**

**San Juan, Puerto Rico, a 24 de marzo de 2000**


En relación con las elecciones generales, que fueron celebradas en Puerto Rico durante el año 1996, la Comisión Estatal de Elecciones le <u>denegó</u> participación alguna en el Fondo Electoral al Frente Unido Riograndeño, el cual había sido certificado por la referida Comisión, el día 29 de julio de 1996, como "partido local por petición", habiendo éste postulado un candidato a alcalde para el Municipio de Río Grande. Fundó su negativa la Comisión Estatal de Elecciones en la posición de que no resultaba procedente asignarle fondos al Frente Unido Riograndeño debido, alegadamente, a que la Ley Electoral, sólo así

lo autoriza únicamente para partidos políticos que postulen un candidato a gobernador.

El Frente Riograndeño acudió en solicitud de revisión ante la Sala Superior de San Juan del Tribunal de Primera Instancia, la cual <u>denegó</u> su solicitud por el mismo fundamento aducido por la Comisión Estatal. El Frente, no conforme, acudió ante el Tribunal de Circuito de Apelaciones. El foro apelativo intermedio revocó, devolviendo el caso a la Comisión Estatal de Elecciones para que ésta, a base de una fórmula que dicho tribunal ideó, le desembolsara fondos al Frente Riograndeño.

Acudió, vía certiorari, la Comisión Estatal de Elecciones ante este Tribunal. En esencia plantea que la Ley Electoral no concede fondos públicos a los partidos locales por petición y que ello no es inconstitucional. Expedimos el auto. Resolvemos.


I

Analizadas las disposiciones pertinentes de la Ley Electoral, en específico las disposiciones del Artículo 3.022 de dicha Ley y los alegatos de las partes, dictamos Sentencia confirmatoria de la emitida en el presente caso por el Tribunal de Circuito de Apelaciones resolviendo que el Frente Riograndeño tiene derecho a participar en el Fondo Electoral pero sólo en aquello que corresponde a la cantidad base que el Art. 3.023 de la Ley Electoral le asigna a cada partido. En consecuencia, devolvemos el caso a la C.E.E. para que allí se determine si el Frente cumplió con lo dispuesto en los Artículos 3.015 y 3.017 – incluyendo los reglamentos aplicables de la C.E.E.– en lo que respecta a los informes de gastos y otros ingresos. De haber cumplido con lo allí dispuesto, y conforme con lo resuelto por el Tribunal de Circuito de Apelaciones, el Frente tendrá derecho a que se le reembolse las sumas de dinero resultantes de la aplicación de la fórmula establecida por el referido Tribunal de Circuito.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Negrón García emitió Opinión

concurrente; el Juez Asociado señor Rebollo López emitió Opinión concurrente y disidente. El Juez Asociado señor Fuster Berlingeri disiente sin opinión escrita. El Juez Asociado señor Corrada del Río disiente por entender que fue correcta la actuación de la Comisión Estatal de Elecciones de no asignarle fondos al Frente Unido Riograndeño debido a que la Ley Electoral sólo así lo autoriza para partidos políticos que postulen candidatos a gobernador y no a un partido local por petición.


                          Isabel Llompart Zeno
                             Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Frente Unido Riograndeño

   Peticionario-Recurrido


      v.                              CC-96-466      Certiorari


Comisión Estatal de Elecciones,
et al.

   Recurrida-Peticionaria



Opinión Concurrente del Juez Asociado señor Negrón García



San Juan, Puerto Rico, a 24 de marzo de 2000


Bajo nuestra Constitución, el subsidio electoral a partidos políticos con fondos públicos, no puede ereguirse en un esquema legislativo discriminatorio de distribución que de su faz sólo beneficia perpetuar la **Maxipartidocracia**.

I

Desde su origen el Fondo Electoral provee a los partidos políticos principales y por petición una capacidad económica inicial para la divulgación de sus ideas al electorado. P.N.P. v. Tribunal Electoral, 104 D.P.R. 741 (1976). El uso de fondos públicos se justifica, pues son instrumentos a través de los cuales la ciudadanía, en el ejercicio

de sus derechos de asociación y expresión, manifiesta su respaldo u oposición a los diversos programas de gobierno. En conjunción con los demás derechos electorales, afianzan la democracia proponiendo candidatos a cargos públicos. Su participación activa en la estructura administrativa electoral imparte confiabilidad ciudadana a los eventos comiciales, pues representa un medio fiscalizador de las actuaciones gubernamentales y demás partidos.

El Fondo pretende y busca mantener la integridad y pureza del proceso electoral, reduciendo las influencias nocivas y el control de fuerzas económicas contrarias y dañinas a la libertad política democrática y a una sana administración pública.

Bajo el Art. 3.023 de la Ley Electoral[1] sólo pueden acogerse al Fondo los partidos políticos principales o por petición, los cuales tienen como denominador común, la característica de presentar un candidato a la gobernación. Se diferencian entre sí, porque los partidos principales han participado previamente en elecciones generales y han obtenido en la candidatura para la gobernación un por ciento prefijado por la Ley;[2]

---

[1] El Art. 3.023 de la Ley Electoral dispone:

> "En años que no sean de elecciones generales cada **partido político principal o partido por petición** que haya cumplido o satisfecho el procedimiento establecido en la sección que antecede, podrá girar anualmente contra el Fondo Electoral por una cantidad que no se excederá de trescientos mil (300,000) dólares. En años de elecciones generales, los partidos políticos podrán girar contra los remanentes que hayan sobrado en años anteriores, pero el derecho de acumular tales remanentes sólo operará desde el año en que el partido se haya acogido a los beneficios aquí dispuestos.
>
> Se entenderá que un partido político se acoge a los beneficios de esta sección desde el momento en que gira por primera vez contra el Fondo.
>
> En año de elecciones generales cada partido político en unión a su candidato a Gobernador con derecho a los beneficios del Fondo Electoral tendrá derecho, con cargo al mismo, a una cantidad que no excederá de la suma de seiscientos mil (600,000) dólares" 16 L.P.R.A. 3116.

[2] 16 L.P.R.A. 3101(1).

mientras los por petición son de nueva inscripción.[3] **Se excluyen pues, los partidos por petición local en cualquier año, incluso el electoral.**

## II

Más allá de su texto legal, el derecho de un grupo de opinión certificado por la Comisión Estatal de Elecciones como "partido local por petición" a participar del Fondo Electoral tiene un **basamento de génesis constitucional.**

La premisa rectora es que no puede sostenerse un trato desigual en materia electoral. **La ayuda económica gubernamental a candidatos a puestos electivos, no es materia exclusiva de los partidos políticos con candidatos a la gobernación. La libertad de expresión y asociación, así como el derecho al voto, conglomerados en un grupo político, precisan para la participación democrática en la arena electoral, un potencial mínimo económico, proporcionalmente igual al reconocido a los partidos principales y por petición, como corolario a una participación en igualdad de condiciones.**[4]

El Estado fundamenta la exclusión del Frente Unido Riograndeño (F.U.R.) en el hecho de que su radio de acción y participación es limitada, circunscribiéndose a dos (2) precintos de un municipio. Aduce, que el F.U.R. no tiene la misma participación o rol en la estructura del sistema electoral. Arguye además, que sus necesidades de difusión ante una campaña política general, no son comparables con la magnitud de aquellas de los partidos principales, siendo su impacto ante el país mínimo y costo de difusión menor. Vemos pues, que la contención central del Estado es que todos los fundamentos que sirven de base para que se asignen fondos públicos únicamente a los partidos políticos, –por las funciones cuasi gubernamentales que llevan a cabo–, no están presentes en un partido local por petición. **No tiene razón.**

---

[3] 16 L.P.R.A. 3101(3).

[4] Idéntica situación confrontamos ante el reclamo de un candidato independiente en García Martínez v. Comisión Estatal, res. en 30 de septiembre de 1996, 141 D.P.R. ____ (1996), Op. disidente Juez Asociado Sr. Negrón García.

**Este argumento sólo atiende la función cuasi gubernamental de los partidos; sin embargo, sabemos que el Fondo Electoral tiene una mayor justificación.** La razón principal que lo apoya es la importancia de la expresión política en la escala de valores de nuestra constitución. Los derechos de asociación, libertad de expresión y acceso

**Este argumento sólo atiende la función cuasi gubernamental de los partidos; sin embargo, sabemos que el Fondo Electoral tiene una mayor justificación.** La razón principal que lo apoya es la importancia de la expresión política en la escala de valores de nuestra constitución. Los derechos de asociación, libertad de expresión y acceso

a las urnas, no pueden tasarse por el auditorio en que se lleven a cabo. La igualdad -como ingrediente medular del ideal de justicia consagrado por nuestra Constitución, P.R.P. v. E.L.A., 115 D.P.R. 631, 633 (1984)-, es necesaria en cualquier escenario. Este objetivo legítimo, saludable al proceso democrático, conlleva disminuir las diferencias económicas y ventajas entre los participantes de una contienda electoral por razón de desigualdades en riqueza. P.N.P. v. Tribunal Electoral, supra.

Aunque en un área territorial delimitada, los partidos locales realizan idénticas tareas que los partidos principales y los por petición a nivel isla. Además, tienen que cumplir con los mismos requisitos que la Ley Electoral impone a los otros respecto a peticiones de endoso, estados de situación financiera, y limitaciones respecto a las contribuciones que reciben.

Al igual que en García Martínez v. Comisión Estatal, supra, el Estado no esboza ningún interés apremiante que beneficie y justifique un interés común y haga necesario apartarnos de la exigencia de que todos los participantes en contiendas electorales tengan un potencial económico mínimo como secuela a una participación en igualdad de condiciones, tanto en años no eleccionarios como en año de elecciones.

La situación es apremiante. La ausencia de un esquema legislativo que extienda los beneficios y viabilice una distribución equitativa del Fondo Electoral, más allá de los partidos principales y por petición, requiere un remedio judicial temporal, hasta tanto la Asamblea Legislativa establezca otro diseño.

El Frente Unido Riograndeño (F.U.R.) es acreedor, al menos, a una participación en el Fondo proporcional a aquellos electores a los cuales su programa quiere hacer llegar. Como partido local, la cantidad a ser asignada no puede ser la misma a la establecida por la Ley Electoral para los partidos principales o por petición que cubren toda la isla. En este extremo, coincidimos con el criterio del reputado Tribunal de Circuito (Hons. González Román, Brau Ramírez y Colón Birriel) de que es necesario prorratear su participación a base de una relación entre la totalidad de

electores inscritos a nivel isla y los electores inscritos comprendidos en los precintos 95 y 96, de los cuales obtuvo su franquicia local, **logrando así un subsidio monetario equitativo.[5] Al aplicar esta formula, la participación monetaria del F.U.R. en el Fondo, para año eleccionario es de \$7,399.99[6] y en año regular de \$3.699.99.[7]**

**Nuestro proceso político democrático responde al mandato de igualdad consagrado en la Constitución: es robusta cuando no entorpecemos la libertad de expresión ciudadana y débil cuando ignoramos reclamos válidos que condenan normas que la obstaculizan.**

ANTONIO S. NEGRÓN GARCÍA
Juez Asociado

---

[5]

$$\frac{\text{Núm. de Electores Precintos 95 y 96}}{\text{Total Electores Isla}} \quad X \quad \begin{array}{c}\text{Cantidad}\\ \text{establecida por}\\ \text{Ley Electoral}\\ \text{contra la cual}\\ \text{Girar}\end{array}$$

En el caso de autos, el número de electores inscritos se tomará del Informe de Resultados Finales Escrutinio o Recuentos Isla, por Precinto y por Municipios de las elecciones generales de 3 de noviembre de 1992, preparado por la Comisión Estatal de Elecciones.

[6]   $\dfrac{(1,951 + 25,705)}{2,242,381} \quad X \quad 600,000$

[7]   $\dfrac{(1,951 + 25,705)}{2,242,381} \quad X \quad 300,000$

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Frente Unido Riograndeño

    Peticionario- Recurrido

       v.                   CC-96-466     CERTIORARI

Comisión Estatal de Elecciones
Et Al

    Recurrida- Peticionaria


OPINIÓN CONCURRENTE Y DISIDENTE EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ


San Juan, Puerto Rico a 24 de marzo de 2000


Por considerar que el tema, y controversia, que plantea el presente caso resulta ser de gran importancia, e interés, para nuestra ciudadanía, hemos entendido necesario expresarnos por separado; ello con el propósito de exponer, en detalle, los fundamentos por los cuales concurrimos y disentimos con, y de, la Sentencia que emite en el mismo el Tribunal en el día de hoy.

I

El Frente Unido Riograndeño ("Frente") fue certificado como un "partido local por petición" por la Comisión Estatal de Elecciones ("C.E.E.")

**el 29 de junio de 1996, luego de presentar los endosos del cinco por ciento del electorado de los precintos 95 y 96, postulando <u>un candidato a alcalde</u> para el Municipio de Río Grande en las Elecciones Generales a ser celebradas en Puerto Rico. El 1ro. de julio de ese año, el Frente solicitó a la C.E.E. que, según lo dispone el Art. 3.022 de la Ley Electoral, 16 L.P.R.A. 3115, se le asignaran los fondos disponibles para ese partido en el Fondo Electoral. La Comisión informó al Frente, el día 9 de agosto de 1996, que no podía asignarle fondos debido a que la Ley Electoral sólo contempla fondos públicos para partidos políticos que postulen un candidato a la gobernación[8] y el Frente únicamente contaba con candidatos para ocupar posiciones locales en Río Grande.**

Inconforme, el Frente radicó una petición de revisión ante el Tribunal de Primera Instancia, Sala Superior de San Juan. Incluyó como parte al Estado Libre Asociado ("E.L.A.") ya que los dineros del Fondo están bajo la custodia del Secretario de Hacienda. El tribunal de instancia dictó sentencia declarando <u>no ha lugar</u> la petición. En su resolución, el foro de instancia opinó que el Fondo de la Ley Electoral no provee dineros a grupos que no postulan candidatos a la gobernación.

El Frente recurrió en certiorari al Tribunal de Circuito de Apelaciones. Allí, planteó que había errado el tribunal de instancia al interpretar que la Ley Electoral no concede participación monetaria a un partido local por petición y, al resolver, que es constitucionalmente permisible una interpretación de esa índole. El tribunal apelativo intermedio ordenó a la C.E.E. que mostrara causa por la cual no debía revocar la decisión del foro de instancia. Ocho días después, el 30 de octubre, ese foro emitió una decisión, revocatoria de la emitida por el tribunal de instancia, en donde reconoció al Frente participación en el Fondo Electoral, ordenándole a

_____

la C.E.E. el desembolso de los dineros a base de una fórmula que esbozó en su decisión.[9]

Inconforme, la C.E.E. nos solicitó que revisáramos la referida decisión. La C.E.E. plantea que la sentencia es de imposible cumplimiento; que la Ley Electoral no concede fondos públicos a los partidos locales por petición y que ello no es inconstitucional.

Por su parte, el Frente argumenta que este Tribunal carece de jurisdicción para revisar la determinación del foro apelativo.[10] En la alternativa, nos pide que revisemos la decisión emitida con el propósito de que se le reconozca, de una vez y por todas, participación plena de los dineros del Fondo Electoral.

El Tribunal expidió el auto de certiorari.

II

De entrada, atendemos el planteamiento sobre la alegada falta de jurisdicción de este Tribunal. El Frente apuntala su contención en unas disposiciones especiales del Artículo 1.016 de la Ley Electoral, 16 L.P.R.A. secc. 3016a, las cuales permiten acelerar la revisión judicial de decisiones tomadas por la C.E.E. dentro de los treinta días previos a un evento electoral. El citado Artículo dispone que:

> "Cualquier parte afectada por una resolución, determinación y orden de la Comisión Estatal podrá dentro de los diez (10) días siguientes a la notificación de la misma recurrir ante el Tribunal Superior mediante la radicación de un escrito de revisión. [... ]
>
> El Tribunal Superior [...] deberá resolver dicha revisión dentro de un término no mayor de veinte (20) días, contados a partir de la fecha de sometida la misma.
>
> Dentro de los treinta (30) días anteriores a un evento electoral el término para radicar el escrito de revisión

---

[8] A pesar que la determinación se tomó el día 17 de julio de 1996, no fue sino hasta el 9 de agosto de 1996 que la C.E.E. comunicó la misma.

[9] El foro intermedio prorrateó la participación del Frente. Para ello, el referido tribunal tomó el número de electores inscritos en los precintos para los cuales fue certificado el Frente y dividió entre el número de electores inscritos en toda la Isla.

[10] El Frente se basa en lo dispuesto en el Art. 1.016 de la Ley Electoral. El mismo establece que dentro de los treinta días anteriores a la celebración de un evento electoral, el término para revisar una determinación de la C.E.E. será de veinticuatro (24) horas.

será de veinticuatro (24) horas y aquél para resolverla no mayor de cinco (5) días, luego de sometido el caso.

Todo asunto o controversia que surja dentro de los cinco (5) días previos a la celebración de una elección deberá resolverse no más tarde del día siguiente a su radicación. [... ]"

La C.E.E. reclama, por su parte, la jurisdicción de este Tribunal, según lo dispuesto en el Art. 3.002(f) de la Ley de Judicatura, según enmendada por la Ley Número 248 de 25 de diciembre de 1995, 4 L.P.R.A. 22i.[11]

Las disposiciones de la Ley Electoral a las que el Frente alude son claramente inaplicables al caso de autos. Como se desprende de su texto, el citado Art. 1.106 de la Ley Electoral se refiere a los procedimientos que se presentan ante el Tribunal de Primera Instancia procedentes de la C.E.E.. Nos parece evidente que la disposición se refiere a recursos que llegan al tribunal de instancia provenientes de la Comisión. Los términos dispuestos en la Ley Electoral proveen para que las determinaciones que la C.E.E. tome, a pocos días de unas elecciones, sean revisables por el tribunal de primera instancia con una prontitud tal que se protejan los derechos de las partes a tiempo para el evento electoral. Aquí no estamos ante la situación de hechos contemplada en dicho estatuto. Por el contrario, estamos frente a un recurso de revisión que nos llega del foro apelativo intermedio que, a su vez, atendió el caso tras la determinación de instancia.

Lo que pretende el Frente es que apliquemos al caso de autos un término jurisdiccional por analogía. Ello resulta improcedente toda vez que la Ley de la Judicatura establece, en forma específica, el plazo dentro del cual la parte afectada debe acudir ante un foro apelativo.

_____

[11] Ese Artículo fue renumerado en la mencionada enmienda como el Art. 3.002. El inciso (f) sigue siendo el de aplicación aquí. Este señala que el Tribunal Supremo conocerá de los siguientes asuntos: "[m]ediante auto de certiorari, a ser expedido discrecionalmente, revisará las sentencias del Tribunal de Circuito de Apelaciones dictadas por virtud de la sec. 3016a del Título 16, conocidas como la "Ley Electoral de Puerto Rico", y del inciso (c) de la sec. 22k de este título. El término jurisdiccional para presentar este

En el caso ante nos, aplica el Art. 3.002(f) de la Ley de Judicatura, según enmendada por la Ley Número 248 de 25 de diciembre de 1995, supra, que otorga diez días a la parte afectada por la decisión del tribunal apelativo intermedio para que acuda ante este Foro en recurso de certiorari.

**Por otro lado, la Regla 21[12] del Reglamento del Tribunal Supremo, 4 L.P.R.A., Ap. XXI-A, R. 21, paraliza el término para presentar un certiorari mientras el Tribunal de Circuito de Apelaciones resuelve una moción de reconsideración. Una vez notificada la determinación, que sobre una moción de reconsideración hace el tribunal apelativo, el término para recurrir en certiorari comienza nuevamente a decursar, teniendo la parte afectada diez días para presentar su recurso ante este Tribunal.**

**En el caso de marras, el archivo en autos de la copia de la notificación de la sentencia, denegando la última moción de reconsideración que interrumpió el término, ocurrió el 2 de diciembre de 1996. La solicitud de certiorari fue radicada el 12 de diciembre de 1996, o sea, el décimo día después de comenzado a decursar el antes mencionado término. Por lo tanto, concluimos que este recurso fue presentado dentro del término dispuesto para ello y este Tribunal tiene jurisdicción para intervenir en el mismo.**

**Resuelto este planteamiento, examinamos los errores que la C.E.E. levanta sobre la resolución emitida por el Tribunal de Circuito de Apelaciones.**

---

recurso es de diez (10) días contados a partir del archivo en autos de copia de la notificación de la sentencia recurrida.", 4 L.P.R.A. 22i(f).

[12] "(A)  Término para presentar el recurso.
   (1)    El recurso de certiorari  para revisar las sentencias del Tribunal de Circuito de Apelaciones, descrito en el inciso (a)(6) de la Regla 20 de este Apéndice [referente a las sentencias dictadas por el Tribunal de Circuito de Apelaciones en virtud de la Ley Electoral], se formalizará
   (2)    mediante la presentación de una solicitud dentro del término jurisdiccional de diez (10) días. El término para presentar la petición de certiorari  ante el Tribunal Supremo comenzará a contar desde el archivo en autos de copia de la notificación de la sentencia. Sin embargo, cuando se presentare una moción de reconsideración ante el Tribunal de Circuito de Apelaciones el término para recurrir al Tribunal Supremo comenzará a contar desde el archivo en autos de copia de la notificación de la resolución resolviendo la moción de reconsideración."

III

En primer lugar, la C.E.E. sostiene que la decisión del Tribunal de Circuito de Apelaciones es de imposible cumplimiento. En esencia, alega que los dineros del Fondo Electoral no están bajo su control y sí bajo el control exclusivo del Departamento de Hacienda. Veamos.

El Fondo tuvo su génesis en el Art. 3.021 de la Ley Electoral, 16 L.P.R.A. 3114.[13] De éste se benefician los partidos que al mismo se acogen voluntariamente. Al así hacerlo, los partidos beneficiarios se someten a ciertas restricciones de ley que los obligan a hacer públicas sus finanzas. Estos fondos se otorgan luego que la C.E.E. certifica a la colectividad como "partido político". Parte de ese proceso de certificación conlleva la clasificación de las colectividades por parte de esa Comisión, según las categorías que se definen en el propio estatuto.

El primer párrafo del Art. 3.023[14] de la Ley Electoral, 16 L.P.R.A. 3116, establece el Fondo a través del cual se autoriza al Secretario de Hacienda a desembolsar la cantidad que esa Ley ordena pagar a los partidos. Dicha cantidad variará dependiendo de si es o no

---

[13] "Se establece en las cuentas del Departamento de Hacienda un fondo especial denominado "Fondo Electoral", el cual se pondrá a disposición del Secretario de Hacienda para llevar a cabo los fines de este Subtítulo, y se asigna, de cualesquiera fondos disponibles en el Tesoro Estatal, la cantidad necesaria para permitirle a cada uno de los partidos, según se dispone más adelante, el uso de las cantidades, que así se le autorizan." Art. 3.021.

[14] "En años que no sean de elecciones generales cada partido político principal o partido por petición que haya cumplido o satisfecho el procedimiento establecido en la sección que antecede, podrá girar anualmente contra el Fondo Electoral por una cantidad que no se excederá de trescientos mil (300,000) dólares. En años de elecciones generales, los partidos políticos podrán girar contra los remanentes que hayan sobrado en años anteriores, pero el derecho de acumular tales remanentes sólo operará desde el año en que el partido se haya acogido a los beneficios aquí dispuestos.

Se entenderá que un partido político se acoge a los beneficios de esta sección desde el momento en que gira por primera vez contra el Fondo." Art. 3.023.

año de elecciones generales. Así, los partidos podrán girar anualmente <u>hasta</u> trescientos mil dólares ($300,000.00) en años que no sean de elecciones generales.

En los años que sí son de elecciones generales, <u>a los partidos con candidato a gobernador</u>, se les autoriza girar <u>hasta</u> seiscientos mil dólares ($600,000.00), según se dispone en el tercer párrafo del Art. 3.023[15]. Además, a estos se le asigna una cantidad cuya fórmula está contenida en el Art. 3.024, 16 L.P.R.A. 3117, denominada "crédito adicional".[16] La misma no es una cantidad fija ya que, según se dispone en la Ley Electoral, esta dependerá del número de electores que finalmente queden inscritos para las elecciones.

Nos parece evidente, que, contrario a lo que plantea la C.E.E., ni el Departamento de Hacienda, ni la Comisión, ni la Legislatura pueden determinar la cifra de dinero específica que se asignará al Fondo para la fecha en que se aprueba el presupuesto gubernamental. Esa cifra puede ser estimada pero no se puede determinar con exactitud hasta el cierre del Registro Electoral, ya que la misma dependerá del número de electores que finalmente queden inscritos para votar.

No le asiste la razón, en consecuencia, a la C.E.E. en su planteamiento de que no puede cumplir con lo ordenado por el Tribunal de Circuito en vista del hecho de que ella no contaba con dicho dinero. <u>La C.E.E., efectivamente, es la agencia llamada a hacer la determinación de si el partido en cuestión tiene o no derecho a participar del Fondo para que, luego que el Departamento de Hacienda haga el cálculo final, ese Departamento desembolse el dinero a base de la autorización que la C.E.E. otorga con su certificación.</u>

---

[15] "En año de elecciones generales cada partido político en unión a su candidato a Gobernador con derecho a los beneficios del Fondo Electoral tendrá derecho, con cargo al mismo, a una cantidad que no excederá de la suma de seiscientos mil (600,000) dólares." Art. 3.023.

[16] "(a) Crédito adicional. - En año de elecciones generales existirá un crédito adicional, que será la cantidad que resulte a base de un dólar con cincuenta centavos ($1.50) por cada elector que figure en el Registro General de Electores. Dicha cantidad se distribuirá por partes iguales entre todos los partidos políticos en unión a sus candidatos a Gobernador. Este crédito estará disponible para los partidos

**IV**

Como segundo error, la C.E.E. plantea que la Ley que establece el Fondo Electoral no concede beneficios a los "partidos locales por petición". Veamos si le asiste la razón.

El Art. 3.023 de la Ley Electoral, supra[17], autoriza los fondos que serán otorgados en años que no sean de elecciones generales. Al así hacerlo, la Ley Electoral únicamente menciona a los "partidos principales" y a los "partidos por petición". Para pronunciarnos sobre el efecto que esta aparente enumeración o exclusión pueda tener, debemos, primero, atender las diferentes categorías de "partido político", según definidas en la Ley Electoral.

La Ley Electoral reconoce varios tipos de partidos políticos. Los grupos ciudadanos tienen la posibilidad de ser certificados por la C.E.E. dentro de una de estas categorías de partidos. La clasificación dependerá de los criterios que la Ley establece para cada una de las categorías. La C.E.E. tiene la facultad de llevar a cabo esta certificación como parte de las labores encaminadas a regular los eventos electorales en Puerto Rico, según ordenado por la propia Legislatura.[18] Para realizar esas funciones el legislador aprobó la Ley Electoral.

En el Art. 3.001 de la Ley Electoral, se establecieron ciertas diferencias entre las agrupaciones políticas que participan en las elecciones, a saber:

> "A los efectos de este Subtítulo, <u>se entenderá por "partido político" a los partidos principales y los partidos por petición</u>.
>
> (1) Se considerará "Partido Principal" todo aquél no coligado[19] que obtuviera en el encasillado correspondiente a

---

políticos cuyos candidatos a Gobernador se acojan a las disposiciones y límites establecidos en este Capítulo." Art. 3.024.

[17] Ver nota al calce número 7.

[18] "La Comisión Estatal de Elecciones será responsable de planificar, organizar, estructurar, dirigir y supervisar el organismo electoral y todos los procedimientos de naturaleza electoral que, conforme este Subtítulo y sus reglamentos, rijan en cualquier elección a celebrarse en Puerto Rico." Art. 1.005, 16 L.P.R.A. 3013.

[19] "Coligado" es definido como "unido o confederado con otro u otros". <u>Diccionario de la Lengua Española</u>, Vigésima edición, Tomo I, p.337, Real Academia Española, 1984.

su insignia en la papeleta para Gobernador y Comisionado Residente, en la elección general precedente una cantidad de votos no menor de siete (7) por ciento del total de votos depositados para todas las insignias de partidos, o que obtuviera en la papeleta para Gobernador y Comisionado Residente en la elección precedente una cantidad no menor del tres (3) por ciento del total de papeletas íntegras depositadas para todos los partidos; o cuyo candidato a Gobernador obtuviere en la elección general precedente una cantidad no menor de cinco (5) por ciento del total de votos depositados para todos los candidatos a dicho cargo. En el caso de partidos coligados, la determinación de la condición de partido principal se hará individualmente para cada uno de los que componen la coligación, requiriéndole la obtención del número de votos antes señalados, marcados para su candidato a Gobernador, para su insignia, o papeleta íntegra que, como partido aparte y separado de los otros, hubiere ocupado en la papeleta electoral.

(2) Se entenderá como "Partido Principal de Mayoría" aquel partido principal cuyo candidato a Gobernador de Puerto Rico hubiere obtenido en la elección general precedente, exclusivamente en la columna de la papeleta electoral correspondiente a dicho partido, el mayor número de los votos depositados para todos los candidatos al cargo electivo de referencia.

(3) Se considerará como "Partido por Petición" a cualquier agrupación de ciudadanos que, con el propósito de figurar en las papeletas electorales de unas elecciones generales, en o antes del primero de junio del año de elecciones se inscriba como partido político mediante la radicación ante la Comisión de peticiones juradas al efecto, ante notarios públicos admitidos al ejercicio de la notaría, a tenor con lo dispuesto por la Ley Notarial vigente, quienes percibirán un (1) dólar por cada petición notarizada válida como honorarios, suscritas por un número de electores no menor del cinco (5) por ciento del total de votos depositados para todos los candidatos al cargo de Gobernador en la elección general precedente.

(4) Se entenderá "Partido Local por Petición", cualquier agrupación de ciudadanos que con el propósito de figurar en unas elecciones generales en las papeletas electorales de un precinto, distrito representativo o distrito senatorial específico, se inscriba como partido político local mediante la radicación ante la Comisión de peticiones privadas al efecto, suscritas, en cada uno de los precintos en que debe aparecer su candidatura, por un número de electores no menor del cinco (5) por ciento del total de votos depositados en éstos para todos los candidatos al cargo de Gobernador en la elección general precedente. Deberá, además, presentar un programa de gobierno o plataforma política, así como los nombres y direcciones de un grupo de electores que constituyan un organismo directivo central.

Al aceptar dichas peticiones por la Comisión el partido local por petición quedará inscrito.

Dicho partido local podrá designar una candidatura a través del procedimiento a tal fin establecido en este Subtítulo, la cual sólo estará compuesta por candidatos a

los cargos electivos que puedan votarse en el precinto o precintos que correspondan." [Enfasis nuestro.]

De acuerdo con este diseño legislativo, las categorías de los partidos dependen, en primera instancia, del área donde pretenden buscar el apoyo del electorado. A modo de ejemplo, si un partido concentra sus esfuerzos en sólo una parte de la Isla, entonces, éste será denominado "local". Si por el contrario, el partido propone un programa que afecta al electorado en general, entonces, puede convertirse en un "partido por petición". La categoría de "partido principal" estaría sólo disponible cuando el "partido por petición" haya obtenido el apoyo de un por ciento determinado del electorado.[20]

Una vez establecidas las diferencias entre los partidos políticos, debemos atender la controversia planteada en torno a si el estatuto provee o no fondos públicos para un "partido local por petición". Como mencionamos, el Art. 3.021 de la Ley Electoral, supra, establece el Fondo Electoral.[21] En el Art. 3.022, la Asamblea Legislativa especificó la manera en que los "partidos políticos por petición" comenzarán a tener participación del Fondo.[22] Nótese, sin embargo, que esa mención que específicamente se hace del "partido por petición" se debe a que en ese Artículo se parte de la premisa de que, si el partido logra mantener su franquicia electoral, este continuará disfrutando de los beneficios del Fondo al convertirse en "partido principal". A esos efectos es que se aprobó el citado Art. 3.022.

El Art. 3.023 ordena una cantidad fija con cargo al Fondo para cada partido político, en años que no sean de elecciones generales.[23]

---

[20] Así se dispone en las definiciones del Art. 3.001 que requiere a los partidos un grado de apoyo en las urnas previo a ser certificado como un "partido principal".

[21] Ver nota al calce núm. 7.

[22] "Se entenderá que un partido político por petición se acoge a los beneficios del Fondo Electoral desde la fecha en que el organismo directivo central del partido lo solicite a la Comisión y gire contra dicho Fondo Electoral." Art. 3.022.

[23] "En años que no sean de elecciones generales cada partido principal o partido por petición que haya cumplido o satisfecho el procedimiento establecido en la sección que antecede, podrá girar anualmente contra

Allí, se dispone que "en años que no sean de elecciones generales cada partido político principal o partido por petición [...] podrá girar anualmente contra el Fondo Electoral por una cantidad que no excederá de trescientos mil ($300,000) dólares." [Énfasis nuestro]. Luego, en ese mismo artículo, se añade que "[e]n año de elecciones generales cada partido político en unión a su candidato a Gobernador con derecho a los beneficios del Fondo Electoral tendrá derecho, con cargo al mismo, a una cantidad que no excederá de la suma de seiscientos mil ($600,000) dólares." [Énfasis nuestro]. Como puede apreciarse, no es hasta el tercer párrafo del citado artículo, que se hace una distinción entre los "partidos políticos" con o sin candidato a gobernador.

Hay que destacar, entonces, que la Asamblea Legislativa distinguió entre los fondos disponibles para "cada partido político" y aquellos autorizados para "partidos políticos en unión a su candidato a gobernador". En nuestra opinión, la Ley Electoral establece esta clasificación o distinción sólo cuando asigna una cantidad de dinero adicional disponible para los años de elecciones generales.[24]

Pero hay más. En la Exposición de Motivos de la Ley Núm. 110 del 30 de junio de 1957, que es reconocida como la génesis del Fondo Electoral, se expusieron las premisas legislativas que lo inspiraron y que este Tribunal recogió en P.N.P. v. Tribunal, 104 D.P.R. 741, 751 (1976). En lo pertinente, dicha exposición de motivos establece que:

---

el Fondo por una cantidad que no excederá de trescientos mil (300,000) dólares.  En años de elecciones generales, los partidos políticos podrán girar contra los remanentes que hayan sobrado en años anteriores, pero el derecho de acumular tales remanentes solo operará desde el año en que el partido se haya acogido a los beneficios aquí dispuestos.

Se entenderá que un partido político se acoge a los beneficios de esta sección desde el momento en que gire por primera vez contra el Fondo.

En año de elecciones generales cada partido político en unión a su candidato a Gobernador con derecho a los beneficios del Fondo Electoral tendrá derecho, con cargo al mismo, a una cantidad que no excederá de la suma de seiscientos mil (600.000) dólares." [Énfasis nuestro.] Art. 3.023

"Es principio universalmente reconocido que los partidos políticos son instrumentos necesarios a la democracia para que a través de ellos el pueblo pueda respaldar programas y expresar mandatos con relación a su gobierno.

Todos los partidos democráticos, mayoría y minoría, cumplen estas funciones: los de la mayoría en respaldo a la obra de gobierno [...]; los de la minoría para que expresen el punto de vista de otra parte del pueblo con miras a tratar de convencer a una mayoría para ciertos fines distintos en ciertas formas diferentes, y velar porque el programa respaldado por la mayoría sea en efecto administrado con igualdad para todos.

**Por tales razones, es de profundo interés público el que los partidos políticos puedan estar libres de control por fuerzas económicas, privadas o gubernamentales...**"

**Con esto en mente el legislador diseñó un fondo electoral del cual, con dineros públicos, se subsidiaría esa labor cuasigubernamental de los partidos. Estos fondos fueron, por tanto, <u>otorgados con el claro propósito de reducir la posibilidad que grupos de poder compraran la conciencia de los partidos</u>, permitiendo que las colectividades defendieran sin ataduras los verdaderos intereses del grupo al cual representan.**

Posteriormente, en la Exposición de Motivos de la Ley Núm. 169 de 11 de agosto de 1995, en donde se aprobaron enmiendas que aumentaron las cantidades de dinero otorgadas a los partidos en los Artículos 3.023 y 3.024, la Asamblea Legislativa expuso que, con la medida, se provee para la "subsistencia de los partidos al costear parte de sus actividades electorales salvaguardándolos de una dependencia económica externa al interés gubernamental y social que debe guiar la existencia de los partidos."

Al resolver el caso de marras debemos tener en cuenta que los partidos políticos son <u>indispensables</u> para el funcionamiento de una democracia. Estos están investidos de poderes cuasi gubernamentales y constituyen el vehículo de expresión colectiva ciudadana para canalizar, pacíficamente, las distintas ideas políticas e intereses de los varios sectores de opinión del país. El subsidio a través de un

---

[24] **Estos artículos fueron sujetos a enmiendas tan recientemente como el 11 de agosto de 1995, o sea, poco menos de un año antes de que surgieran los hechos que se plantean en esta controversia.**

fondo electoral para financiar sus actividades es un ejemplo vivo de esa "característica pública". <u>P.R.P.</u> v. <u>E.L.A.,</u> 115 D.P.R. 631 (1984).

Más aun, abona a nuestra posición, las exigencias que hace la Ley Electoral al "partido local por petición". <u>A este se le requiere lo mismo que al "partido por petición" a nivel Isla, o sea, los endosos de por lo menos cinco por ciento del electorado. La exigencia es la misma, el esfuerzo es el mismo y, por tanto, somos del criterio que el trato no puede ser desigual y discriminatorio.</u> En otras palabras, somos del criterio que resulta incuestionable que los partidos políticos locales por petición <u>tienen derecho a participar en la cantidad base que establece el citado Artículo 3.023 de la Ley Electoral</u>; ello <u>hasta</u> la suma de $300,000.00.

Debe recordarse que en <u>Marrero</u> v. <u>Municipio de Morovis</u>, 115 D.P.R. 643, 646 (1984), expresamos:

> "Al presente, en materia electoral <u>no</u> se cuestiona seriamente el postulado de igualdad inmerso en nuestra Constitución. <u>Históricamente ese ideal ha cobrado vida en el esquema integral financiero trazado por la Asamblea Legislativa para lograr paridad económica entre los partidos políticos y los candidatos.</u> [...] A tono con esa visión y hasta el presente, todas las leyes electorales han reconocido a los partidos el derecho a participar en un Fondo Electoral." (Enfasis suplido).

Igualmente importante resulta lo expresado por este Tribunal, en el caso de <u>P.R.P.</u> v. <u>E.L.A.,</u> 115 D.P.R. 631, 641 (1984), a los efectos de que:

"[u]na vez reconocida y conferida la franquicia electoral a un partido no puede sostenerse válidamente un trato desigual en materia de representación en los diferentes organismos que crea la Ley Electoral ni en materia de ayuda económica gubernamental." (Enfasis suplido.)

Ahora bien, resuelto esto, debemos aclarar que el Frente no pudo acogerse a los beneficios del Fondo según lo dispuesto en el Art. 3.022[25], debido a que la C.E.E. no le brindó acceso al mismo. Atendido lo anteriormente resuelto, en la eventualidad de que el Frente hubiese cumplido, sustancialmente, con las disposiciones de los Artículos 3.015[26] y 3.017[27] de la Ley Electoral, supra, éste podría recobrar los

---

[25] "Se entenderá que un partido político por petición se acoge a los beneficios del Fondo Electoral desde la fecha en que el organismo directivo central del partido lo solicite a la Comisión y gire contra dicho Fondo Electoral." [Enfasis nuestro].

[26] "Todo partido político con derecho a participar del Fondo Electoral, deberá llevar una contabilidad competa y detallada de cualquier gasto incurrido con cargo al mismo. Deberá asimismo, rendir a la Comisión y al Secretario de Hacienda un informe debidamente juramentado, expresivo de tales gastos e indicativo de la fecha en que se hubiera incurrido en los mismos y el nombre completo y dirección de la persona a favor de la cual se efectuó el pago, así como el concepto por el cual se incurrió en el mismo. Dicho informe deberá presentarse cada tres (3) meses dentro de los primeros diez (10) días siguientes al final del período del informe.
  El Secretario de Hacienda no autorizará desembolso alguno con cargo al Fondo Electoral a favor de un partido o candidato, hasta tanto se cumpla con lo dispuesto en esta sección.
      Todo partido acogido al Fondo Electoral que se exceda en sus gastos de campaña de los límites establecidos en este Subtítulo, o sus reglamentos, estará sujeto al pago de una penalidad equivalente a dos (2) veces de la cantidad en que se hubiere excedido de los límites dispuestos en este Subtítulo. La Comisión acudirá ante el Tribunal de Justicia competente con el recurso apropiado para impedir la continuada violación a este Subtítulo y lograr el cumplimiento del pago de la penalidad civil aquí estatuida. Los dineros recobrados por virtud de esta disposición legal, pasarán a formar parte del Fondo Electoral para ser utilizados conforme a lo dispuesto en este Subtítulo."

[27] "(a) Cada partido político, cada candidato, excluyendo a los candidatos a asambleístas municipales, y cada persona o grupo político independiente, deberá llevar una contabilidad completa y detallada de toda contribución recibida en o fuera de Puerto Rico y de todo gasto por él incurrido sin cargo al Fondo Electoral y rendirá cada tres (3) meses, bajo juramento, un informe contentivo de una relación de dichas contribuciones y gastos, fecha en que los mismos se recibieron o en que se incurrió en los mismos, nombre y dirección completo de la persona que hizo la contribución o a favor de quien se hizo el pago, así como el concepto por el cual se incurrió en dicho gasto.
Los candidatos deberán rendir un primer informe acumulativo de las contribuciones recibidas o gastos incurridos hasta el 30 de junio del año anterior de una elección general y subsiguientemente en las fechas dispuestas en este título.
(b) Cuando en cualquier acto político colectivo incluyendo mass meetings, maratones, concentraciones, pasadías u otros actos similares, se efectúe cualquier recaudación de dinero, el recaudador o los recaudadores deberán, luego de efectuada la misma, levantar una acta juramentada, haciendo constar:
(1) El tipo de acto político celebrado;
(2) un estimado del número de asistentes al mismo;
(3) el total de dinero recaudado y;
(4) que ninguno de los donantes aportó cantidad alguna en exceso de las permitidas en este subtítulo. Dicha acta deberá radicarse en la Comisión Electoral dentro de los cinco (5) días siguientes a la fecha en que se haya celebrado la actividad en cuestión.
(c) Comenzando el primero de septiembre del año anterior al de elecciones generales, el informe de que trata el inciso (a) de esta sección deberá rendirse ante la Comisión Electoral mensualmente antes del quinto

gastos incurridos --excluyendo las donaciones, por supuesto - desde el momento en que fue certificado como partido político local por petición hasta la fecha en que se celebraron las elecciones generales en el año de 1996.

## V

Al resolver que la Ley Electoral clasifica a los partidos para otorgar o negarle asistencia económica, debemos considerar la legalidad de dicha clasificación <u>en lo que respecta a la otorgación del crédito adicional que se autoriza para los años de elecciones generales.</u>

La Ley Electoral distingue entre el partido con candidato a gobernador y aquel que no postula aspirantes a ese puesto. Esta clasificación es reconocida por ambas partes. No obstante, el Frente alega que negarle fondos del crédito adicional <u>debido</u> a dicha clasificación sería inconstitucional. La C.E.E. propone que al así clasificar, la Asamblea Legislativa simplemente está ejerciendo su autoridad para determinar y reglamentar todo lo concerniente al proceso electoral según lo dispuesto en la Sección 4 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico.[28]

En Puerto Rico existe una garantía constitucional que protege contra el discrimen por razón de raza, sexo, origen, condición social, ideas políticas o religiosas, Art. II, Sec. 7, Constitución del Estado Libre Asociado de Puerto Rico. Estas garantías surgen del reconocimiento de que la dignidad del ser humano es inviolable.

Sin embargo, es doctrina firmemente establecida que la cláusula constitucional que garantiza la igual protección de las leyes <u>no</u> exige un trato igual para todos los ciudadanos, sino que lo que prohibe es un trato desigual e injustificado. <u>Zachry International</u> v. <u>Tribunal Superior</u>, 104 D.P.R. 267, 276-277 (1975); <u>M. & B.S., Inc.</u> v. <u>Depto. de Agricultura</u>, 118 D.P.R. 319, 332 (1987); R. Rotunda, J. E. Nowak y J. N. Young, <u>Treatise on Constitutional Law: Substance and Procedure</u>, Minnesota, West Pub. Co., Sec. 18.2, 1986.

La existencia de una clasificación en un estatuto <u>no</u> implica, de por sí sola, que la garantía constitucional sobre la igual protección de las leyes ha sido violada. <u>P.S.P.</u> v. <u>Romero Barceló</u>, 110 D.P.R. 248, 260 (1980). Más aun, hemos aclarado que, al enfrentarnos a una alegación de clasificación injustificada la cuestión determinante es, en esencia, la <u>razonabilidad</u> de la clasificación realizada. <u>Zachry International</u> v. <u>Tribunal Superior</u>, ante, 277.

Cuando se impugna un estatuto electoral a base de que este contiene una clasificación que, se alega, viola la igual protección de las leyes pero que 1) no es

---

día del mes siguiente al del informe. Desde el 1ro. de octubre del año de elecciones hasta el último día de dicho año, los informes se radicarán por quincenas, el día 1ro. y el día 15 de cada mes. El último informe que cubrirá las transacciones posteriores al primero de enero del año siguiente al de una elección, se radicará noventa (90) días después de la misma.

(d) Las disposiciones establecidas en los incisos anteriores serán aplicables a toda elección, referéndum, plebiscito o cualquier proceso de naturaleza electoral y los informes al respecto deberán radicarse en las fechas que por reglamento disponga la Comisión Estatal de Elecciones.

(e) A los fines de radicar los informes requeridos en esta sección, se considerará candidato a toda aquella persona que en cualquier momento antes de su nominación, por sí o a través de otra persona, grupo o entidad, reciba una contribución para ser utilizada en una elección en la cual el receptor de la contribución haya de figurar como candidato."

[28] Allí se autoriza que: "se dispondrá por ley todo lo concerniente al proceso electoral de inscripción de electores así como lo relativo a los partidos políticos y candidaturas."

**sospechosa de su faz, 2) no descansa en criterios constitucionales impermisibles y, 3) tampoco tiene el efecto de impedir o gravar sustancialmente el ejercicio de la franquicia electoral, un tribunal <u>no</u> debe analizar la razonabilidad de dicha clasificación a base de un escrutinio estricto, sino que debe usar el análisis tradicional o racional. <u>P.S.P.</u> v. <u>Romero Barceló</u>, ante, 260-261.**

Por otro lado, ese mismo escrutinio racional es el que debe ser utilizado al evaluar    la validez constitucional de una ordenanza cuya naturaleza es de orden socioeconómico. <u>Salas</u> v. <u>Munic. de Moca</u>, 119 D.P.R. 625, 632-633 (1987); <u>Marina Ind. v. Brown Boveri Corp</u>., 114 D.P.R. 64, (1983). Bajo este análisis tradicional una clasificación no debe ser invalidada, a menos que sea claramente arbitraria y no pueda establecerse nexo racional alguno entre la misma y un interés legítimo del estado. <u>P.S.P</u>. v. <u>Romero Barceló</u>, ante; <u>M. & B.S., Inc</u>. v. <u>Depto. de Agricultura</u>, ante, 333. Siempre que pueda concebirse, razonablemente, una situación de hechos que justifique la clasificación, la ley no será declarada inconstitucional. <u>Marina Ind., Inc</u>. v. <u>Brown Boveri Corp</u>., ante; <u>Coca Cola Bottling Co</u>. v. <u>Srio. de Hacienda</u>, 112 D.P.R. 707, 710 (1982). <u>U.S. Brewers Asoc</u>. v. <u>Srio. de Hacienda</u>, 109 D.P.R. 456, 461 (1980); <u>León Rosario</u> v. <u>Torres</u>, 109 D.P.R. 804, 813-815 (1980); <u>Wackenhut Corp</u>. v. <u>Rodríguez Aponte</u>, 100 D.P.R. 518, 531 (1972); <u>P.S.P</u>. v. <u>Romero Barceló</u>, ante, 261 (1980).

Como puede verse, aún cuando la protección constitucional contra el discrimen por clasificación es abarcadora, <u>la misma permite que la Asamblea Legislativa apruebe ciertas clasificaciones siempre y cuando haya una razón justificada para ello</u>. Ese criterio mínimo es el que exigimos en el escrutinio tradicional. A través del mismo se permite que una ley clasifique entre personas o grupos dándoles, incluso, distinto trato. Lo que siempre habrá que examinar, para determinar si la clasificación es válida a la luz del escrutinio tradicional, será la razonabilidad de la misma y si el motivo para clasificar fue válido. <u>León</u> v. <u>Torres</u>, 109 D.P.R. 804, 815 (1980); <u>U.S. Brewers</u> v. <u>Secretario</u>, ante, 462 (1980). <u>Este, no hay duda, es el escrutinio que debe ser aplicado en el presente caso ya que nos enfrentamos a una clasificación que otorga beneficios socioeconómicos</u>.

En la esfera federal, el Tribunal Supremo de los Estados Unidos se enfrentó a una situación similar a la del presente caso, en Buckley v. Valeo, 424 U.S. 1 (1976). Allí se discutieron las disposiciones de un estatuto a través del cual el estado reembolsó a los candidatos presidenciales parte de sus gastos de campaña electoral. Para determinar la cantidad de fondos disponibles para cada grupo, se tomaba en cuenta el apoyo electoral. En su decisión el Tribunal determinó que tras la medida había importantes intereses gubernamentales. El Profesor Tribe[29], nos dice, en relación a dicho caso, que "[i]n particular, the Court deemed it appropriate to deny aid to candidates with marginal public support in order that the Act not "foster frivolous candidacies, create a system of splintered parties, and encourage unrestrained factionalism".

En el caso Buckley el Tribunal Supremo federal se enfrentó a una medida en la cual, como ocurre en el caso ante nos, se establecen categorías entre los partidos políticos. A diferencia del nuestro, dicho estatuto autorizaba el subsidio después de celebrada una elección. Mediante dicha ley, el Congreso de los Estados Unidos estableció criterios a base de los cuales se otorgarían fondos públicos a los partidos; la categoría dependería de los resultados de las elecciones y, por ende, del apoyo electoral. A mayor el apoyo, mayor el subsidio y viceversa. El Tribunal Supremo federal sostuvo la validez del estatuto a pesar de las alegaciones en el sentido de que el mismo violaba el debido proceso de ley garantizado en la Quinta Enmienda de la Constitución de los Estados Unidos.

Es de notar que en el citado caso de Buckley, como en el que hoy nos ocupa, la ley no impide que un candidato pueda figurar en la papeleta como tampoco impide a un elector votar por el candidato de su predilección.

---

[29] Lawrence Tribe, "American Constitutional Law", Foundation Press, 2nd Ed. 1988, p. 1150.

**Debemos, pues, determinar en el presente caso: primero, si la clasificación no resulta sospechosa de su faz; segundo, si esta no descansa en criterios constitucionales impermisibles; tercero, si tiene el efecto de impedir o gravar sustancialmente el ejercicio de la franquicia electoral; y, por último, determinar si esta clasificación es claramente arbitraria esto es, si la misma no tiene nexo racional alguno con el interés que tuvo el Estado en su creación.**

El Fondo que provee la Ley Electoral tiene como objetivo ofrecer subsidio público a los partidos políticos para que estos, por un lado, contribuyan con ideas al desarrollo de la obra de gobierno mientras que, por otro lado, se les obliga a que sus finanzas sean sometidas al escrutinio público. <u>Este fin, nos parece, es evidentemente legítimo</u>. Con la Ley Electoral se consigue el doble propósito de financiar a los partidos políticos para colocarlos en igualdad de condiciones mientras que, a la misma vez, se logra un control de los donativos que estos reciben. Por tanto, estamos aquí frente a un beneficio socioeconómico otorgado por el gobierno. Este Fondo no es una obligación del estado ni un derecho fundamental de cada ciudadano.

**Para lograr este fin, el legislador se ideó las disposiciones del Fondo Electoral. Con el mismo se autorizó la otorgación de dinero para cada partido político. No obstante, y con el importante interés de que los dineros sean utilizados por grupos que verdaderamente representen los intereses de un número considerable de electores, la Ley Electoral formuló una serie de requisitos con los cuales se restringe el acceso a dichos fondos públicos.**

**Entre estos requisitos puede mencionarse la presentación de los endosos de un por ciento determinado del electorado, mantener la franquicia electoral luego de un sufragio general y que el partido tenga un candidato a la gobernación. Este último requisito es el que aquí, se alega, resulta ser una clasificación injustificada y discriminatoria.**

Considerando que lo que exige el criterio del escrutinio racional es que el objetivo de la ley tenga alguna relación con los medios que se emplean para lograrlos, debemos concluir que la reglamentación aquí discutida es constitucionalmente válida. **Nos parece razonable pensar que el legislador quisiera limitar los cientos de miles de dólares que cada cuatro años se entregan a los partidos políticos, por concepto del llamado "crédito adicional", a sólo aquellas agrupaciones en las que se postule un candidato a la gobernación, ya que es esa colectividad la que planteará soluciones a los problemas que aquejan a todo el país y que pueden ser resueltos a través de la obra de gobierno impulsada desde la Rama Ejecutiva.** Los partidos políticos locales, por su parte, se concentran en asuntos que sólo tienen relevancia y afectan a una parte del electorado; resulta razonable, en consecuencia, que no tengan derecho a ese "crédito adicional".

## VI

Por último, debemos atender el error que el Frente alega, cometió el tribunal apelativo intermedio al asignarle una cantidad de fondos menor a la que se otorga en el Art. 3.023 ($300,000.00). El Tribunal de Circuito de Apelaciones tomó como base la cantidad de trescientos mil dólares y lo prorrateó, dividiendo el número de electores inscritos en los precintos para los que fue certificado el Frente entre el número total de electores inscritos en Puerto Rico. Entendemos que erró el tribunal. No encontramos razón alguna para prorratear la cantidad asignada.

Reiteradamente hemos resuelto que, cuando la letra de la ley es clara, no hay espacio para interpretaciones y, por lo tanto, la voluntad del legislador tiene que ser respetada. Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14; Vázquez v. A.R.P.E. 128 D.P.R. 513 (1991); Pueblo v. Ortega Santiago, 125 D.P.R. 203 (1990); Meléndez v. Tribunal Superior, 90 D.P.R. 656 (1964).

En este caso el estatuto es claro: se <u>reembolsará</u> anualmente <u>hasta</u> la cantidad de $300,000.00 a cada partido político local. No vemos margen para interpretación alguna dentro de lo que allí expresamente se dispone.

Por los fundamentos antes expuestos es que concurrimos y disentimos de la Sentencia mayoritaria emitida.


                    FRANCISCO REBOLLO LÓPEZ
                        Juez Asociado